STATE WHOLESALE GROCERS, a corporation; Zeigmund Wholesale Grocery Co., Inc., a corporation; Ralph C. Berg, d/b/a Berg's Food Store; Leo Bernard, d/b/a Leo's Food Mart; Bernard Bruski, d/b/a United Meat Market; Eph Goldstein, d/b/a Goldstein's Progressive Foods; Earl Larson and Warren Larson, co-partners, d/b/a Franklin Grocery and Market; Jack Levin and Harvey Berebitsky, co-partners, d/b/a Harvey's Supermart; O. V. Makela, d/b/a Makela's Food Store; John L. Maleviti's, d/b/a Fruitland Foods; Jack E. Markus, d/b/a Alliance Meat Shop; Carmen Mastri, d/b/a Cicero Lake Food Mart; Steven J. Minarik, d/b/a Norward Park I.G.A.; Henry E. Muir and Hugh A. Muir, co-partners, d/b/a Fifth Avenue Food Mart; Stanley Piekarz, d/b/a Steven's Certified Super Marts; Anthony Racz, d/b/a Save-Way Food Mart; Edw. J. Schuetz, d/b/a Schuetz's I.G.A. Super-Marts; Joseph D. Stone, d/b/a Clover Food Mart; Robert M. Wagner and Elizabeth Wagner, co-partners, d/b/a Wagner Grocery and Market; Atlas Market Company, a corporation; Dominicks Finer Foods, Inc., a corporation; Carl A. Schletz, Inc., a corporation, Plaintiffs,

v.

The GREAT ATLANTIC AND PACIFIC TEA COMPANY, a corporation; Woman's Day, Inc., a corporation; General Foods Corporation, a corporation; Hunt Foods, Inc., a corporation; Morton Salt Company, a corporation, Defendants.

No. 56 C 418.

United States District Court
N. D. Illinois, E. D.
July 25, 1957.

Marks, Marks & Kaplan, Libit, Lindauer & Henry, Chicago, Ill., for plaintiffs.

Hopkins, Sutter, Owen, Mulroy & Wentz, Miller, Gorham, Wescott & Adams, McBride & Baker, Chicago, Ill., Cahill, Gordon, Reindel & Ohl, New York City, for defendants.

CAMPBELL, District Judge.

This is a private action for treble damages and injunctive relief brought under Sections 4 and 16 of the Clayton Act.[1] Plaintiffs are twenty retail and two wholesale grocers located in the Chicago Metropolitan Area who bring this action on behalf of themselves and all retail and wholesale grocers similarly situated as an alleged class suit under Rule 23(a) (3) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Defendants are The Great Atlantic and Pacific Tea Company (New Jersey), Woman's Day, Inc., General Foods Corporation, Hunt Foods, Inc., and the Morton Salt Company.

The Great Atlantic and Pacific Tea Company (New Jersey), hereinafter referred to as A&P (New Jersey), is a wholly owned subsidiary of The Great Atlantic and Pacific Tea Company of America, hereinafter referred to as A&P (Maryland). A&P (New Jersey) operates the A&P retail stores in the Chicago Metropolitan Area and is one of the three A&P companies which operate retail grocery stores throughout the United States. Where distinction between these two companies is not material, they will be referred to herein, individually or collectively, as "A&P."

Woman's Day, Inc., publishes Woman's Day, a women's magazine which is issued monthly and sold to A&P operating companies, including A&P (New Jersey), for resale only through A&P stores. Woman's Day, Inc. is a wholly owned subsidiary of A&P (Maryland).

General Foods, Hunt Foods and Morton Salt are food product manufacturers whose brand name products are sold throughout the United States by practically all retail grocers, including the plaintiff retailers and A&P (New Jersey). These three food manufacturers will hereinafter be referred to collectively as the defendant suppliers.

By the Court's memorandum and order of June 21, 1956 the issue of liability, including the issue of the fact of damages, was severed for trial from the issue of the amount of damages, the issue of the amount of damages having been reserved for reference to a Master when and if the issue of liability was resolved in favor of the plaintiffs. Subsequently, through the efforts of able and experienced counsel representing all the parties to this action, the issue of liability was tried on facts agreed upon and exhibits admitted into evidence pursuant to stipulations entered into by and between the respective parties in many pre-trial conferences. The interpretation and legal effect to be accorded these facts were argued by the parties in written briefs, and the issue of liability was taken under advisement by the Court.

Plaintiffs anchor their claim upon Sections 2(d) and 2(e) of the Clayton Act as amended by the Robinson-Patman Act.[2,3] Additionally, however, plaintiffs, in an attempt to hold A&P (New Jersey) liable under Section 2(f) of the Act, 15 U.S.C.A. § 13(f), assert that the practices of the defendant suppliers, which the plaintiffs claim violate Sections 2(d) and 2(e), violate Section 2(a) as well.[4] Specifically and in capsule

1. Title 15 U.S.C.A. §§ 15 and 26.
2. Title 15 U.S.C.A. §§ 13(d) and 13(e).
3. Plaintiffs dropped all charges under the Sherman Act 15 U.S.C.A. §§ 1–7, 15 note, during the pretrial period.
4. Title 15 U.S.C.A. § 13(a).

form, plaintiffs complain that the defendant suppliers advertise their various products in Woman's Day without making these "services" or "facilities" available to the plaintiffs on proportionally equal terms. This activity, plaintiffs argue, violates Sections 2(d) and 2(e) of the Act and, as a consequence, Section 2(a) as well.

Sections 2(d) and 2(e) of the Clayton Act as amended by the Robinson-Patman Act provide as follows:

"(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

"(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

■ It seems clear, upon a study of these sections, that Sections 2(d) and 2(e) are companion sections and that distinctions between them should not be drawn merely because of the differences in terminology employed in each section. These sections are companion sections to the extent that they have the same purpose and seek to eliminate the same evil; but although they have the same purpose, each section achieves the same result by proscribing different methods of attaining the common result condemned. Thus, while Section 2(d) prohibits *payment by the seller for services or facilities undertaken by the buyer*, Section 2(e) proscribes *services or facilities furnished by the seller to the buyer*. I shall first consider whether the evidence establishes that the defendants have violated Section 2(e) of the Act.

### The Section 2(e) Issue

Here plaintiffs argue, in effect, that food suppliers, of whom the defendant suppliers are but three, furnish, or contribute to the furnishing of, Woman's Day magazine to A&P (New Jersey) since their payments for advertisements in Woman's Day recoup for A&P a substantial part of the annual cost necessary to produce Woman's Day. It has been stipulated that the annual cost of producing Woman's Day exceeds $9,000,000. Of that sum, less than one-quarter is recovered through the sale of copies, the remaining three-quarters being recovered from the sale of advertising space. The advertisers in Woman's Day are categorized as either "suppliers" or "non-suppliers." Supplier advertisers are manufacturers, such as the defendant suppliers, whose products are sold in A&P stores; conversely, non-supplier advertisers are manufacturers whose products are not sold in A&P stores. It has been stipulated that in 1954, 73.3 per cent of the advertising revenue, or $6,905,021, was received from supplier advertisers as against 26.7 per cent, or $2,508,822 received from non-supplier advertisers. In 1955, 65.5 per cent, or $6,073,693 was received from suppliers while 34.5 per cent, or $3,205,488 was received from non-suppliers. These figures, plaintiffs argue, conclusively show that Woman's Day magazine is "made possible" by the paid advertisements of food suppliers, such as the instant defendant suppliers. Plaintiffs reason that without the payments for the advertising of the food suppliers, Woman's Day magazine could not exist, unless this multi-

million dollar cost expenditure was assumed by A&P itself. Plaintiffs conclude, therefore, that the defendant suppliers furnish, or contribute to the furnishing of, a service of facility, Woman's Day magazine, "to or for" the benefit of A&P (New Jersey).

It is, of course, true that, in a loose sense, a patron of a store, an advertiser in a magazine or newspaper, "makes" that particular business "possible." However, it seems that this is a clear case of the proverbial tail wagging the proverbial dog. Business patrons, whether the purchaser or the advertiser, are attracted by the quality of the business entity with which they place their patronage. For example, a leading department store, such as one of the several that we have in the Chicagoland area, is not made possible by the customers that patronize that store—it is made possible by such things as the quality and variety of merchandise offered for sale, pleasant shopping facilities and salespeople, liberal charge and exchange policies, eagerness to stand behind the products offered for sale at its store, and all such factors which contribute to the successful operation of any business. The store's success is made possible by the policies adopted and executed by its management. Thus, it is the store itself, through the expertise of its management, that makes the business of its customers possible, and it is not the customers that make the store possible.

And so it is with any leading newspaper or magazine, such as Woman's Day. Advertisements placed in these media are made possible or attracted by the quality of the medium itself. Thus, prescinding from the fact that A&P (Maryland) must have made a substantial investment in Woman's Day at the very beginning, if not later, and prescinding also from the fact that the direct copy sales of Woman's Day and the advertising of the non-suppliers, together, comprise a substantial percentage of the cost of producing Woman's Day (not to mention the supplier advertisers whose products, perhaps, are not handled by the plaintiffs), it seems quite obvious that Woman's Day magazine, and the advertisements therein, are "made possible" by the admitted high quality of the magazine itself, which high quality, in turn, is "made possible" by the expertise of the management of Woman's Day, Inc. There is a considerable amount of ingenuity, skill, creativeness and perseverance which goes into the publishing of any high quality magazine much the same as these qualities go into the successful operation of any business in a highly competitive business world. These qualities, apparently, are possessed by the management of Woman's Day, which, admittedly, is a high quality magazine, having been, for 14 years, among the top ten national magazines in circulation and among the top twenty-five in advertising revenue. Thus, it is the high quality of Woman's Day, reflected by its editorial content, that sells the magazine to the public—these sales, in turn, attract the advertising revenue of such manufacturers as the defendant suppliers. It seems manifestly clear that a magazine the public will not buy cannot earn advertising revenue and it seems equally clear that the public does not buy a magazine for its advertisements but for its editorial content. As counsel for A&P and Woman's Day argue, the advertiser's payment and all other revenue of the publishing entity lose all identity in the process of publishing the magazine.

Thus, the conclusion is inescapable that the defendant suppliers do not furnish or contribute to the furnishing of Woman's Day magazine to A&P within the meaning of Section 2(e) of the Act. What we have here are advertisements placed by food suppliers in a top ranking magazine which is published by a wholly owned subsidiary of A&P (Maryland). Both the magazine and the advertisements therein contained are furnished by A&P (Maryland) through Woman's Day, Inc. The evidence fails to reveal that the defendant suppliers have furnished, or have contributed to the furnishing of, any services or facilities to or for the

benefit of A&P. If plaintiffs can be heard to complain of any activity on the part of the defendant suppliers, it is the payments by these suppliers for their advertisements which they place in Woman's Day magazine. Therefore, if plaintiffs have a cause of action at all it is for possible violations of Section 2(d) which prohibits payment by the supplier for services furnished by the purchaser.

For the reasons stated, I hold that the plaintiffs have failed to prove that the defendant suppliers have furnished, or have contributed to the furnishing of, any service or facility to A&P within the meaning of Section 2(e) of the Clayton Act, as amended by the Robinson-Patman Act.

### The Section 2(d) Issue

In discussing Section 2(d), it becomes necessary to examine the methods employed by each of the defendant suppliers in determining the medium in which each should advertise, and particularly whether each should advertise in Woman's Day magazine.

### General Foods

General Foods is a large food merchandising company which handles more than 50 different grocery store products. In its 1956 fiscal year it sold $759,200,000 worth of grocery products and spent more than $75,180,000 in advertising them.

General Foods is comprised of eleven operating divisions. The marketing function of each division selling grocery store products is in charge of a marketing manager who is responsible for the advertising and selling of all the products of that division. Reporting to the marketing manager are the product group managers or the particular product managers. Product group managers and product managers are responsible for the development and execution of marketing plans, including advertising plans, for the specific products assigned to them. Both the initial and final decision on the contents of a marketing plan are made by the product group manager or product manager, subject to the approval of his superiors. The responsibility of selecting and recommending the specific advertising media within the framework of the marketing plan rests with the particular advertising agency retained by the company.

In determining what medium should be used to advertise a particular product (whether magazines, newspapers, outdoor posters, car cards, radio or television), General Foods' advertising agencies take many factors into consideration. These factors include the stated objectives of the advertising program; the nature and strength of the competition; who are the prospective purchasers of the products—i. e., men, women, children, age, income bracket, educational level; the locality where these prospects live—i. e., in small towns and rural communities, in cities, in metropolitan centers, in which geographical areas of the country; and the distribution pattern of the particular product.

If the agency retained by General Foods determines that an advertising effort or part of any advertising effort should be through magazines, the selection of the magazines, or of a particular magazine, requires the weighing of many considerations, such as circulation, geographical distribution of readers, cost per thousand circulation, number of readers for each copy, characteristics of the magazine and its readers, education and income level of the magazine's audience, the prestige of the magazine, and the nature and quality of its editorial material.

Applying these general considerations to the case at bar, it has been stipulated that the criteria considered by General Foods in determining whether or not Woman's Day was to be included in a media schedule for a particular product were the same criteria that were considered by General Foods in the selection of any other magazine or medium.

### Hunt Foods

Hunt Foods is a large food merchandising company which handles more than 15 different grocery store products. In

its 1955 fiscal year Hunt sold $85,558,-310 worth of grocery products and spent $5,741,000 advertising them. Hunt's advertising program is prepared by its advertising department in consultation with the particular advertising agency retained by it.

Hunt considers many criteria and factors in selecting publications in which to advertise its products. Among these factors are the publication's circulation, and all aspects thereof including not only the total figure but also the pattern of this circulation by geographical areas. Hunt also considers the cost of using the publication, and specifically, the base page rate and quantity and frequency discounts. Another criterion that Hunt considers is the audience statistics such as the relation of men to women readers and how large the total audience becomes as a result of secondary and pass-along readership. Hunt also considers the editorial policies of the publication and its mechanical quality, such as the process by which it is printed and the quality and size of its paper. Hunt gives primary consideration to an adequate "national" advertising program using media whose circulation figures bear a proper relationship to the national population pattern. After providing for national coverage, Hunt then considers those media which have a more regional than national influence.

The extent of Hunt's advertising in any particular medium is determined by the amount of money which can be allocated to advertising in a given period and by selecting the medium that it feels best reaches the potential customers of its products and also best serves its designated purposes.

In deciding to advertise in Woman's Day magazine, Hunt has used and considered the same factors and criteria which it considered in determining to advertise in any other publication.

### Morton Salt Company

Morton Salt is a substantial producer of various salt products. In 1955 Morton sold 7,327,672 units of salt products and spent $2,342,619 in advertising them. Morton's advertising program is the result of consultations and deliberations between Morton's advertising agency and Morton's advertising department.

In determining whether to advertise in a particular publication, Morton considers that publication's total circulation; its cost per thousand circulation; its gross cost; the characteristics of the publication's readers according to age, education, etc.; the publication's geographical circulation and circulation in terms of population density both as compared with Morton's sales and total grocery store sales; and, finally, Morton also considers the quality of the printing reproduction. In deciding to advertise in Woman's Day, Morton has been guided by the same factors that it considered in determining to advertise in any magazine.

In summation, viewing the processes which the defendant suppliers utilized in choosing to advertise in Woman's Day magazine, the evidence is clear that these defendants chose to advertise in Woman's Day after having weighed the same criteria that they considered before advertising in any medium and, more specifically, in any magazine. Woman's Day magazine met the test to which each of the defendant suppliers placed any magazine, passed it, and, as a consequence, each of the defendant suppliers placed their advertisements therein. Thus, there is no evidence of any ulterior motive on the part of the defendant suppliers in advertising in Woman's Day nor does it appear that the defendant suppliers had intended to favor A&P (New Jersey) over any of its other customers. It is also interesting to note that it has been stipulated that the extent to which A&P promotes or merchandises the products of its suppliers is and has been in no way affected by the fact that such suppliers do or do not advertise in Woman's Day or by the extent of such advertising if there is any. Additionally, the evidence also reveals, through the testimony of Harry B. George, National Director of Purchases of A&P, that whether manu-

facturers or processors of grocery store products do or do not advertise in Woman's Day is never considered in any manner by A&P in deciding whether, or to what extent, to purchase their products for resale in A&P retail stores. George also testified that the advertising in Woman's Day by such manufacturers or processors has no effect on the prices paid by A&P for products purchased for resale in A&P retail stores. Plaintiffs, however, attach no significance to this evidence, which they do not dispute, but argue that, nonetheless, the Act has been violated, if equal payments have not been afforded to them.

Nor do the plaintiffs attach any significance to the evidence which clearly reveals that the defendant suppliers receive full value for their payments for their advertisements in Woman's Day. Woman's Day is, admittedly, a high quality magazine enjoying a substantial circulation. This fact, when considered with the fact that the advertising rates charged by Woman's Day, Inc. to all advertisers in Woman's Day, including the defendant suppliers, for advertisements in said magazine are comparable to and competitive with the rates charged and prices paid per thousand circulation in magazines of comparable national circulation, makes the conclusion inescapable that the defendant suppliers receive full value for their advertisements in Woman's Day. Plaintiffs do not contend otherwise but argue that whether the defendant suppliers receive full value is immaterial in view of the fact that like payments by the defendant suppliers were not made available to the plaintiffs on proportionally equal terms.

In support of their position, plaintiffs cite a passage from Congressman Utterbach's speech which was given just before the adoption of the Act. Congressman Utterbach stated:

"The existing evil * * * is, of course, the grant for discriminations under the guise of payments for * * * services which, *whether or not* * * * *actually rendered as agreed,* result in an advantage to the customer so favored as compared with others who have to bear the cost of such services themselves." (Emphasis plaintiffs'.) 80 Cong. Rec. 9418.

Plaintiffs emphasize the words, "whether or not * * * actually rendered as agreed," as indicating that it does not matter that the supplier receives value for his payments for such "services." This reasoning, however, is clearly untenable for it is manifest that Congressman Utterbach was speaking there of services which, of their very nature, were designed primarily to benefit the customer. Thus, if the service paid for is designed primarily to benefit the customer then it matters little if the services are rendered or not—on the one hand, the customer is benefited by the services which the supplier pays for, and on the other hand, the customer, instead of having the services performed, is benefited by keeping the money given him by the supplier. Either way, the customer is benefited and the Act is violated *if* the service to be rendered is designed primarily to benefit the customer.

Thus, in the Senate and House Committee Reports, it is stated:

"Still another favored medium for the granting of oppressive discriminations is found in the practice of large buyer customers to demand, and of their sellers to grant, special allowances in purported payment of advertising and other sales-promotional services, which the customers agree to render with reference to the seller's products, or sometimes with reference to his business generally. Such an allowance becomes unjust when the service is not rendered as agreed and paid for, or when, if rendered, the payment is grossly in excess of its value, or when, in any case the *customer is deriving* from it *equal benefit* to *his own business* and *is thus enabled to shift to his vendor substantial portions of his own advertising cost* while his smaller competitor, unable to command such allowances, cannot do so." (Empha-

sis added.) Senate Report No. 1502, p. 7; House Report No. 2287, p. 15; 74th Cong. 2d Sess. 1936.

 It is apparent, therefore, from a study of this section, as well as from a study of the entire legislative history of the Act, that where there is a service paid for by the supplier, and the service is actually rendered and the amount so paid is not in excess of the value of the service, it is necessary to determine: 1) whether the service would benefit only the supplier; 2) whether the service would benefit only the customer; or 3) whether the service would benefit both the supplier and his customer. If a service can be said to benefit only the supplier or if the service benefits only the customer, there is no difficulty, as in the one case the Act is violated while in the other it is not. However, where it is conceivable that a service might benefit both the supplier and the customer, then, and only then, it becomes necessary to determine whom the services were *primarily* designed to benefit. If the services were primarily designed to benefit the supplier, the Act has not been violated; if the services were primarily designed to benefit the customer, then the Act has been violated unless proportionally equal treatment has been given that customer's competitor. If it is made to appear that equal benefits accrued to both the supplier and his customer from the service, then also the Act has been violated; and in determining whether the customer receives equal benefit, it must be made to appear that the customer has been able to shift to his supplier "substantial portions of *his own advertising costs.*" It becomes necessary, therefore, to examine the nature and extent of the benefits flowing from the defendant suppliers' paid advertisements in Woman's Day magazine.

As has been indicated, the advertisements in Woman's Day of each of the defendant suppliers were the result of a careful evaluation of Woman's Day as an advertising medium, each defendant supplier, through its advertising department and advertising agency, employing the same criteria in choosing to advertise in Woman's Day that it considered in choosing to advertise in any medium. Woman's Day is a high quality magazine of national prominence and it is considered an excellent advertising medium as attested by the list of nationally prominent advertisers (both food suppliers and non-food suppliers) that place their advertisements regularly in Woman's Day. And it is manifest that the defendant suppliers receive full value for their payments for their advertisements in Woman's Day. These facts, when considered with the absence of any evidence tending to establish any purpose or intent on the part of the defendant suppliers, individually or collectively, to favor A&P (New Jersey) over the defendant suppliers' other customers, clearly establish that each of the defendant suppliers' advertisements in Woman's Day was a component part of each supplier's advertising program which was designed only to promote public acceptance of the product advertised and, as such, was designed primarily to benefit each of the defendant suppliers. Indeed, there is no evidence of any ulterior motive on the part of any defendant supplier in advertising in Woman's Day.

Plaintiffs seem to suggest that the advertisements of each of the defendant suppliers in Woman's Day were A&P advertisements. To answer this, it is necessary to distinguish between grocery store advertising and national brand advertising of groceries. Grocery store advertising is designed and intended to bring people into a particular store and features the price of the product and the location of the store. National brand advertising, conversely, mentions no price and does not mention the name or location of any store or stores—it merely attempts to acquaint the reader with the desirability of trying a particular nationally known, brand name product.

In the instant case, the evidence reveals that the advertisements of each of the defendant suppliers were advertisements of the various products handled by each supplier; the advertisements failed

to make any reference to the price of the particular product advertised, nor did they include any mention of the name or location of any store where these products might be purchased. Indeed, the copy of each of the defendant suppliers' advertisements in Woman's Day was identical with the copy run by each defendant supplier in other magazines and newspapers that were issued at or about the same time as was the particular issue of Woman's Day. Thus, the copy of each of the defendant suppliers' advertisements in Woman's Day was not in any way tailored to that magazine. The conclusion is inescapable that the advertisements of each of the defendant suppliers in Woman's Day were national brand advertisements of grocery products as distinguished from grocery store advertisements. This is but one of the facts which conclusively establish that the advertisements of each of the defendant suppliers were not A&P advertisements but were advertisements primarily designed to benefit each defendant supplier by promoting the sales of defendant suppliers' products to as many potential purchasers as possible, with the benefits accruing to A&P being only incidental.

That the advertisements of the defendant suppliers in Woman's Day were not A&P advertisements but national brand name grocery product advertisements with the benefits accruing to A&P being incidental to the benefits accruing to the defendant suppliers, is also established by the evidence that conclusively shows that the defendant suppliers' product advertising in Woman's Day aids in the sale of the advertised products by all grocers who carry the product advertised. This finding is based on several facts, the most important of which is that purchasers of food products do substantial shopping in more than one store. Indeed, the plaintiffs themselves, in attempting to show competition between A&P stores and independent retailers, argue, in their briefs, that the A&P and the independent are competing for the trade of the same customer "who interchanges his patronage."

The document entitled Bench Marks for the Next Five Years in Grocery Selling (Morton's Ex. 11), which was an address given to the National-American Wholesale Grocers Association, on September 13, 1955 by Curtis C. Rogers, Executive Vice President of the Market Research Corporation of America, contains some rather illuminating statistics concerning store loyalty of shoppers. On page 5 of this document, Rogers states, with respect to Chart VI appearing on that page:

"But families don't shop in just one grocery store. The average family shops in 3.7 stores per month. The families shopping in independent stores average 2.6 stores per month, while the exclusive chain store families shop in nearly 2 stores per month. But remember that ⅔ of all of the families shop in both chains and independents, and this group are really shoppers—they average 4½ stores per month."

And on page 11 of Morton's Exhibit 11, Rogers states with respect to Chart XII appearing on that page:

"We find that out of each 100 families who bought coffee in Store A, 44 made their next purchase of coffee at some other store—on canned vegetables, 56 bought their second purchase at some other store —and on frozen vegetables, 52 bought next at a different store. The *housewife shops* where she can get the *brands* and the *products* that she wants at prices that represent the best value to her." (Emphasis his.)

The findings contained in Chart XII of Morton's Exhibit 11 were the result of a two-week shopping history of typical grocery items, while the findings reflected by Chart VI appear to be the result of a 15-year study of that particular topic. These findings are persuasive in corroborating what I believe to be facts that cannot be seriously disputed. Competition between grocery stores is very keen and in these days of the high cost of living, the housewife is well aware of the

necessity of seeking out a bargain. As a result, the housewife shops "where she can get the *brands* and the *products* that she wants at prices that represent the best value to her." She becomes acquainted with the necessary facts concerning a bargain in a number of ways, one of which being the grocery store advertisements appearing in newspapers and in handbills distributed to the homes in the vicinity of a particular store. On the other hand, the national brand grocery product advertising by the defendant suppliers appearing in Woman's Day might acquaint the reader with the desirability of trying a particular brand name food or keep the name of that product before the public, much the same as it does when it appears in other magazines such as Life, McCall's, Look, etc., but that advertising is not a suggestion, much less a command, to purchase the article at A&P. The food shopper buys where she can purchase the brands and products at the least cost to her. If an advertisement in Woman's Day attracts her attention favorably, she will purchase that product at one of the stores which she patronizes, if the price is right. Thus, viewing the lack of store loyalty among grocery store shoppers, and considering the fact that the grocery shopper interchanges her patronage and buys where she can get the quality product for the least money, and considering also the fact that the defendant suppliers' advertisements in Woman's Day are national brand name grocery product advertisements, which suggest neither the price nor place where the products might be purchased, I find that the advertisements by the defendant suppliers in Woman's Day magazine are designed to aid in the sale of the advertised products by all grocers who carry that product and not merely A&P. Accordingly, I find that, assuming that said advertisements in Woman's Day do the job that they were intended to do, the advertisements in Woman's Day have, in fact, aided in the sales of the advertised products in all grocery stores and not merely A&P stores.

Corroborative of this finding is a letter (A&P Ex. 61) received by Woman's Day, Inc. from Heublein & Bro., makers of A. 1 Sauce. After informing Woman's Day that Heublein's experience was that Woman's Day produced an unusually high number of requests for an advertised A. 1 Sauce booklet, the letter dated December 3, 1943, stated as follows:

"Therefore, I am very happy to tell you of the swell job Woman's Day is doing for A. 1 Sauce. Even more significant is the fact that we can definitely trace a substantial increase in the sales of A. 1 Sauce since we started using Woman's Day several years ago; not only through the A&P Stores, where the magazine is distributed but also through the other stores located in the neighborhood of the A&P stores.

"This indicates to us an increased sale through all outlets catering to and competing for the business in the shopping neighborhoods adjacent to an A&P Store where Woman's Day is distributed."

Plaintiffs seek to discredit the weight of this letter by arguing that Woman's Day apparently could find only one such document from thousands of documents that were available to it. Assuming that this is true, nevertheless no document was introduced which stated a position contrary to the contents of Heublein's letter. Furthermore, the Heublein letter merely corroborates the conclusion drawn from the other evidence adduced; that is, the nature of the particular type of advertising in Woman's Day and the lack of store loyalty among grocery shoppers conclusively show that the defendant suppliers' advertisements in Woman's Day aided in the sales of the products advertised not only in A&P stores but also in all grocery stores carrying that particular product.

Underlying the conclusion that advertisements in Woman's Day aid in the general sale of the particular product advertised, is the fact that Woman's Day is not an "in-store" promotional device.

In other words, although the shopper purchases the magazine in an A&P store, she does not read the magazine in the store. Thus, the shopper picks up a copy of the magazine at the check-out counter of an A&P store and does not get an opportunity to read the magazine until she leaves the store. That being the case, she is not exposed to defendant suppliers' advertisements in Woman's Day until after she leaves the A&P store. Assuming that an advertisement in Woman's Day arouses her desire to purchase a particular product, the shopper is free to purchase that product in the next store she visits if the price is acceptable. And it should be observed that many copies of Woman's Day are passed along to other readers who perhaps do not shop at an A&P store. Clearly, therefore, Woman's Day is not an "in-store" promotional device and, as such, the advertisements therein may benefit all grocery stores and not merely A&P stores.

Concerning the issue whether A&P shifts substantial portions of its own advertising costs to the defendant suppliers, here again, plaintiffs' position is unsupported by the evidence. As has been indicated, the advertisements in issue were designed primarily to benefit each of the defendant suppliers for which each received full benefit for their payments. The benefit accruing to A&P from these advertisements was merely incidental to that accruing to each of the defendant suppliers. These advertisements were not A&P advertisements but national brand grocery product advertisements. The evidence reveals that A&P spends millions of dollars in advertising each year. It is also interesting to note that the various A&P manufacturing subsidiaries, which compete with the defendant suppliers, advertise their products in Woman's Day for which full payment to Woman's Day, Inc. is made. Plaintiffs attempt to belittle these facts by arguing that A&P derives cost-free advertising from the promotion and sale of Woman's Day. Underlying this contention, however, is plaintiffs' argument that the defendant suppliers make Woman's Day possible by their payments for advertisements therein; but this contention, as has been indicated hereinbefore in this memorandum, is totally without merit. Nor is it true that A&P receives cost-free advertising from Woman's Day because the record shows that A&P has paid for certain of Woman's Day's advertisements on radio, television and in the newspapers, and the record also reflects that the costs of distribution of the magazine from the warehouse to the store are assumed by A&P, not to mention the fact that certain A&P employees devote an appreciable amount of time in the promotion, distribution and sale of Woman's Day. It is quite apparent, therefore, from the evidence adduced that A&P does not shift substantial portions of its own advertising costs to the defendant suppliers.

For the reasons stated, I hold that the advertisements of each of the defendant suppliers in Woman's Day magazine were not A&P advertisements but advertisements primarily designed to benefit each of the defendant suppliers who received full value therefrom with the benefits accruing to A&P being incidental to those accruing to each of the defendant suppliers. I also hold that the evidence fails to reveal that A&P has shifted to the defendant suppliers substantial portions of A&P's own advertising costs. Accordingly, I hold that the plaintiffs have failed to prove that the defendant suppliers have violated Section 2(d) of the Clayton Act as amended by the Robinson-Patman Act.

There are, however, other reasons which compel such a finding. The evidence reveals that the defendant suppliers advertised in other store distributed magazines, such as Family Circle, Better Living, Everywoman's and American Family. Better Living was sold by seven of the plaintiffs until it suspended publication in May 1956. At present, none of the plaintiffs offers for sale a store magazine as apparently no such magazine is available for their distribution. However, I think a reasonable inference could be drawn from the evidence

adduced that the defendant suppliers would advertise in a magazine distributed by any of the plaintiffs if it met the fixed standards that must be satisfied before each of the defendant suppliers decided to advertise in any magazine. The question arises, therefore, whether the Act is violated if the one purchaser is unable to furnish the service which that purchaser's competitor furnishes and for which the common supplier makes payment. Stated in another way, assuming *arguendo* that the payments by the defendant suppliers in this case for advertisements in Woman's Day violated Section 2(d) of the Act, how could the defendant suppliers have nullified that violation by making proportionally equal payments to the plaintiffs, if the plaintiffs could not furnish the service for which payment would be made? Congressman Utterbach answers this dilemma by stating:

"But it is further claimed that the provisions of the bill with regard to advertising allowances work a hardship on the small manufacturer, in that they require such allowances to be granted to all competing customers on proportionally equal terms. But proportional to what? Proportional naturally to those customers' purchases and to their *ability and equipment to render or furnish the service or facilities* to be paid for." (Emphasis added.) 80 Cong.Rec. 9416.

██ In the instant case, the plaintiffs do not publish or sell a store distributed magazine and, thus, they are unable and unequipped to render or furnish the services for which payment would be made and for which the defendant suppliers in this case pay Woman's Day. Being so unable to furnish these services, plaintiffs have no standing to complain about the defendant suppliers' advertising in Woman's Day even if it were assumed that these payments violated the Act. This seems manifestly clear from the overall intent of the Act and particularly from the quoted excerpt from Congressman Utterbach's speech. Plaintiffs' suggestion that this difficulty could be cured if A&P made Woman's Day available for sale in all grocery stores, including plaintiffs', is untenable for the simple reason that the Act imposes no such duty on one customer of the common supplier to furnish for his competitor services which the competitor is unable to render and for which the common supplier would make payment to him.

Plaintiffs fail to cite any authority which militates against the conclusions reached in this memorandum. The cases they cite, unlike the case at bar, involved services which were inherently discriminatory in that they could in no way benefit any customer other than the customer to whom the service was given. Thus in each case the service involved was primarily designed to benefit the one customer and not the supplier, or at least the benefits were equal between the two.

In Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 65 S.Ct. 961, 969, 89 L.Ed. 1320, Corn Products spent $750,000 in advertising Curtiss candy bars as being "rich in dextrose." Corn Products had sold dextrose to Curtiss which processed the dextrose into candy bars which Curtiss then sold to the consuming public. The Supreme Court held that Corn Products' failure to make those advertising services available to its customers on proportionally equal terms violated Section 2(e) of the Act. In that case it is quite clear that Corn Products was primarily advertising Curtiss candy bars and that it was assuming advertising costs which properly should have been borne by Curtiss. The results of these advertisements could have in no way benefited any of Curtiss' competitors and thus it could not have been said that the results thereof benefited Corn Products primarily and Curtiss only incidentally.

In Elizabeth Arden Sales Corp. v. Gus Blass Co., 8 Cir., 150 F.2d 988, 161 A.L.R. 370, Elizabeth Arden paid one customer for the entire salary of a store clerk who was provided by that customer to demonstrate Elizabeth Arden products.

However, Elizabeth Arden paid another customer, who was a competitor of its first customer only one-half of the salary of the demonstrator provided by it. The Court of Appeals for the Eighth Circuit held that this unequal treatment to competing customers of Elizabeth Arden bore no reasonable basis and was therefore discriminatory and violative of the Act. Thus, it is again manifest that the demonstrator's service could in no way benefit any competitor of the favored customer. The demonstrator's service was designed primarily to benefit the one customer with Elizabeth Arden assuming costs for services which ordinarily should be assumed by the customer who resells the product to the consumer.

And so it is with the services involved in the Federal Trade Commission cases cited by the plaintiffs. Each case involved services which were inherently discriminatory and which were primarily designed to benefit only the customer. No useful purpose would be gained by going into a more detailed discussion of those cases; suffice it to say that they are readily distinguishable on their facts from the instant case.

### The Section 2(a) and Section 2(f) Issues

Plaintiffs admit that their claim against the defendant suppliers under Section 2(a) of the Act is bottomed on plaintiffs' claim that Sections 2(d) and 2(e) were violated. In other words, they argue that if Sections 2(d) and 2(e) are violated here, then Section 2(a) is violated as well. Plaintiffs urge this position in an attempt to hold A&P liable under Section 2(f) of the Act. Since I have held that the defendant suppliers have not violated either Section 2(d) or 2(e), it follows that I must also hold that plaintiffs have failed to prove that the defendant suppliers have violated Section 2(a) of the Act. Additionally, however, the record fails to reveal that the defendant suppliers have granted A&P either direct or indirect price discriminations; and, even if it could be assumed that plaintiffs sustained their

proof under Section 2(a), the record is devoid of competent evidence tending to prove that A&P knowingly induced a discrimination in price within the purview of Section 2(f) of the Act.

### Plaintiff Wholesalers' Claim

In this memorandum, I have considered plaintiff wholesalers and retailers as comprising one complaining group. Indeed, the wholesalers' claim is predicated on their assertion that their customers, who they claim are similarly situated with the instant retailers, have been injured the same as the instant retailers with the result being that the plaintiff wholesalers are thereby also injured because their customer will buy less from them as a result of defendant suppliers' challenged activities. Prescinding from the logic of such reasoning, it is obvious that the wholesalers' claim is no better than the retailers' claim and, accordingly, the issues must be resolved against them.

In their briefs, plaintiffs make the subtle suggestion that A&P (Maryland) had founded Woman's Day as a means of avoiding the consequences of the Robinson-Patman Act which, plaintiffs indicate, was primarily directed against A&P, among others. Suffice it to say, that this contention finds no support in the record. The record does indicate, however, that Woman's Day is a legitimate business enterprise founded for legitimate purposes. Woman's Day is accepted by the public as an excellent magazine and by established advertising agencies as an excellent advertising medium. The record is absolutely devoid of any evidence that Woman's Day was created for any purpose other than for legitimate business reasons. I find absolutely no conduct on the part of any defendant that could, in any conceivable way, be construed as violative of any of the anti-trust laws.

█ In this case, all parties have cited excerpts from Congressman Patman's book, The Robinson-Patman Act, which was written after the Robinson-Patman Act was adopted by Congress. It should be observed that while resort to the legis-

lative history of an act that appears to be ambiguously drawn is a practice that has long been accepted in American Jurisprudence, I cannot accept the practice of citing, as authority, books or other publications subsequently written by legislators concerning what was or was not intended to be covered by a particular act previously adopted by Congress while the author was a member thereof. In Congressman Patman's book, several questions were put to the author concerning whether, under certain facts, a particular practice would constitute a violation of the Act. The author then stated his opinion whether, on the facts so given, the Robinson-Patman Act would have been violated. The parties in this case have attempted to draw an analogy between the facts of this case and the facts of the particular example-case which best suits their purposes. They conclude this line of persuasion by urging a ruling consistent with the particular advisory opinion rendered by Congressman Patman. While resort by the courts to such a novel procedure of resolving an issue might be a convenient way of disposing of these Robinson-Patman Act cases, it is a practice which would amount to an abandonment by the courts of their judicial function and, as such, cannot be condoned. Although legislative histories may be considered by the courts, a book subsequently written by a legislator, even though he be a co-author of the Act, and with all respect to his good intentions in writing such a book, should be given no consideration by a court in determining whether there has or has not been a violation of a particular act. Such a book might be helpful to a businessman as a guide in conducting his business practices but courts of law should resort to more competent authority.

In reaching the conclusions announced in this memorandum, I am not unmindful of the fact that the defendants have advanced other grounds which might bar the plaintiffs from recovering in the instant case. Since, however, I find defendant suppliers' as well as A&P and Wom-

an's Day's conduct herein so above reproach as far as the Clayton and Robinson-Patman Acts are concerned, I feel it unnecessary to prolong this memorandum by discussing issues that are presented by these defendants in *arguendo* form.

One final word deserves mentioning. I have refrained from discussing much of the evidence submitted by the various parties. Suffice it to say that I have carefully considered all of the evidence submitted and to the extent that this evidence is found as facts to support the conclusions expressed in this memorandum, it will be incorporated in the findings of fact entered herein. Concerning plaintiffs' objection to the admissibility of the Shopping Survey (A&P Ex. 25) proffered by A&P, plaintiffs' objection is overruled and the same may stand as evidence together with the other exhibits that were admitted pursuant to stipulation.

I cannot close this memorandum without commending all counsel of record herein for their outstanding efforts and genuine ability which enabled prompt disposition of the case by submitting it on stipulation.

The many pre-trial conferences in which counsel so effectively participated, the long and tedious hours spent in their various offices resolving differences on specific exhibits and preparing stipulations as well as the willingness of all properly to assist the Court and each other constitute an inspiring exemplification of the highest ideals of the legal profession. I am deeply grateful to all counsel.

### Findings of Fact

1. This is an action brought on March 2, 1956, by certain named retail and wholesale grocers individually and purportedly as representatives of a class under Section 7 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended, 15 U.S.C.A. § 15 note, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman

Act, and under Section 15 of the Act of Congress of October 15, 1914, c. 323, 38 Stat. 736, as amended, 15 U.S.C.A. § 25, entitled "An Act To supplement existing laws against unlawful restraints and monopolies and for other purposes," commonly known as the Clayton Act, for a decree:

(a) Adjudging that the defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, and Sections 2(a), (d), (e) and (f) of the Clayton Act, as amended;

(b) Adjudging that each plaintiff was injured in his business or property thereby;

(c) Preventing and enjoining continuing violations by defendants of said sections of said acts;

(d) Granting to plaintiffs three times the amount by which each of the named plaintiffs was damaged, together with costs and reasonable attorneys' fees; and

(e) Requiring all other members of the class allegedly represented by plaintiffs to file their claims with the Court and have their damages established and granted.

2. On October 23, 1956, plaintiffs abandoned their claim that defendants had violated the Sherman Act, thus leaving only the claim that each plaintiff was injured by alleged violations of Sections 2(a), (d) and (e) of the Clayton Act, as amended, by General Foods Corporation, Hunt Foods, Inc. and Morton Salt Company and of Section 2(f) by The Great Atlantic and Pacific Tea Company.

3. The plaintiffs named in the complaint are twenty-three retail and two wholesale grocers located in the Chicago Metropolitan Area. The plaintiff retailers are retail grocers as distinguished from chain store retail grocers. With but few exceptions each of the plaintiff retailers operates a single store and said stores are located throughout the Metropolitan Area of Chicago. In addition, there are numerous other retail grocers situated within the Chicago Metropolitan Area who handle and sell at retail groceries, meat and produce commodities directly to the consuming public within said area. There are approximately 13,000 such retail grocers in the Chicago Metropolitan Area, all of whom are independent grocers as distinguished from chain store grocers. On October 17, 1956, three of the retail grocers withdrew as plaintiffs (Louis Janowitz, d/b/a Janowitz Finest Foods, Joseph Karas, d/b/a Kostner-Lake Food Market and Henry C. Surowiec, d/b/a Surowiec's Grocery and Market). Both of the plaintiff wholesalers are located in the Metropolitan Area of Chicago. They handle and sell grocery products to independent retailers (not including the plaintiff retailers) as distinguished from chain store retailers, located in the Chicago Metropolitan Area. There are numerous other wholesale grocers who handle and sell grocery products to independent grocers situated within the said area.

4. The action was brought by plaintiffs on their own behalf and also allegedly on behalf of all other retail and wholesale grocers similarly situated within the City of Chicago, Illinois, and also within such part of the area adjacent thereto commonly known as the Metropolitan Area of Chicago as is within the territorial jurisdiction of this Court.

5. The following corporations are defendants to this cause:

(a) The Great Atlantic and Pacific Tea Company (New Jersey), herein referred to as "A&P (New Jersey)," a New Jersey corporation.

(b) Woman's Day, Inc., a New York corporation.

(c) General Foods Corporation (herein referred to as "General Foods"), a Delaware corporation.

(d) Hunt Foods, Inc. (herein referred to as "Hunt Foods"), a Delaware corporation.

(e) Morton Salt Company (herein referred as as "Morton"), an Illinois corporation.

6. A & P (New Jersey) is a wholly owned subsidiary of The Great Atlantic and Pacific Tea Company of America, a

Maryland corporation (herein referred to as "A & P (Maryland)"). The retail stores of The Great Atlantic and Pacific Tea Company (herein referred to as "A & P stores") throughout the United States are operated by A & P (New Jersey), and two other wholly owned subsidiaries of A & P (Maryland), i. e., The Great Atlantic and Pacific Tea Company (Arizona) and The Great Atlantic and Pacific Tea Company (Nevada). The A & P stores in the Chicago Metropolitan Area are operated by A & P (New Jersey). Where distinction between these various companies is not material, they will be referred to herein, individually or collectively, simply as "A & P."

7. Woman's Day, Inc. is a wholly owned subsidiary of A & P (Maryland) and is engaged in the business of publishing the magazine Woman's Day.

8. General Foods, Hunt Foods and Morton are engaged in the manufacture and sale of food products. These three defendants are sometimes referred to collectively herein as the "defendant suppliers."

9. The named plaintiffs are 20 individuals or partnerships operating a total of 24 retail grocery stores of varying sizes located in the Chicago Metropolitan Area, and two wholesale grocers in the City of Chicago who sell to independent retailers.

10. None of plaintiff retailers purchase products from plaintiff wholesalers. Most of plaintiff retailers are members of cooperative buying organizations such as Independent Grocers Alliance, Certified Grocers of Illinois, Grocerland Cooperative, Inc., Progressive Food Stores, Inc., and Central Grocers Co-operative, Inc.

11. Defendant A & P (New Jersey) operates retail grocery stores, including those in the Chicago Metropolitan Area. A & P operates 4,000 retail grocery stores throughout the United States. There are, approximately, 216 A & P stores in the Metropolitan Area of Chicago and 125 in the City of Chicago.

12. Woman's Day, Inc. is engaged in the business of publishing the magazine Woman's Day, which is distributed in A & P stores.

13. A & P (Maryland) owns all of the stock of Woman's Day, Inc. and several corporations which manufacture food products. These products are sold only in A & P stores.

14. General Foods manufactures and distributes through eleven separate divisions a number of nationally known food products such as Jello-O Desserts, Birds Eye Frozen Foods, Post Cereals, etc. These are all advertised under their brand names.

15. Hunt Foods manufactures and distributes tomato catsup, chili sauce, tomato sauce and canned fruits and vegetables under its own name or that of "Snider's" or "Pride of the Farm".

16. Morton manufactures and distributes a variety of salt products, primarily the Blue Package, Miniatures and Salters.

17. Plaintiff retailers, plaintiff wholesalers and A & P sell one or more of the products of each defendant supplier.

18. Each retail plaintiff is a competitive seller of an A & P store in the sense that both stores are seeking to gain the trade of at least one customer. Each plaintiff wholesaler sells grocery products to retail stores, at least one of which is seeking to gain the trade of at least one customer whose trade an A & P store is seeking to gain.

19. At all times pertinent to this suit the sales by General Foods Corporation to A & P in the Chicago Metropolitan Area of some of its products which were advertised in Woman's Day at some time or times during the period from March 1, 1954 to March 31, 1956, were sales in interstate commerce.

20. All sales by Morton pertaining to the issues of this case which have been made to customers in the Metropolitan Area of Chicago, including any made to A & P and wholesaler plaintiffs herein, have been made in interstate commerce.

21. Hunt Foods manufactures products in states other than Illinois and ships the same across state lines to wholesale grocers in Illinois and other states outside of the state of manufacturing, including plaintiff wholesalers and other wholesalers in Chicago and the Metropolitan Area thereof. Products of Hunt Foods, Inc. are sold and distributed by it in interstate commerce directly to A & P.

22. Certain of the products sold by A & P in the Chicago Metropolitan Area including certain products of defendant suppliers were shipped into the Chicago Unit warehouse of A & P by the suppliers from points outside the State of Illinois and thence distributed to A & P stores in said area.

23. All sales to the consumer by retailer plaintiffs and by A & P stores referred to in the Appendix to the A & P Stipulation were consummated in the stores of the respective retailer plaintiffs and said A & P stores. All sales by the two wholesaler plaintiffs were made to customers located in the Chicago Metropolitan Area, including Michigan and Indiana.

24. Woman's Day is printed and bound by Woman's Day, Inc. outside the State of Illinois, and distribution is made by Woman's Day, Inc. to the various warehouses of A & P.

25. The magazine Woman's Day has been published monthly by Woman's Day, Inc. in substantially its present form since October, 1937, and has a monthly circulation of over 3,300,000 copies.

26. Woman's Day is of comparable content and quality with the leading ·women's magazines such as Good Housekeeping, Ladies' Home Journal, Woman's Home Companion and McCall's. It has for 14 years been among the 10 top national magazines in circulation and among the top 25 magazines in terms of advertising revenue, and has won national awards for its accomplishments in editorial, art and homemaking fields.

27. In reporting on the effectiveness of various magazines as advertising media, Woman's Day has frequently been compared by leading independent advertising agencies with the woman's service magazines like Ladies' Home Journal and Woman's Home Companion and other magazines such as Better Homes and Gardens, Saturday Evening Post and Cosmopolitan.

28. Woman's Day is distributed monthly and is sold solely through A & P retail stores, except in Colorado where the magazine is sold on newsstands. The magazine is shipped by Woman's Day, Inc. to A & P warehouses and from there is delivered by A & P trucks to individual retail stores.

29. Woman's Day is usually displayed in A & P stores at the check-out counters.

30. A & P pays Woman's Day, Inc. five cents per copy for the magazine, and it is sold in A & P stores for seven cents per copy.

31. The Board of Directors of Woman's Day, Inc. has included representatives of A & P. However, none of the operating staff or employees of Woman's Day, Inc. is an officer, director or employee of any A & P affiliated company.

32. The business of publishing Woman's Day is and has been conducted by Woman's Day, Inc. as a legitimate publishing business enterprise. Except for normal parent-subsidiary relationships and the distribution and promotion of Woman's Day by A & P, Woman's Day, Inc. has been kept separate from the grocery retailing business of A & P.

33. The annual cost of producing Woman's Day exceeds nine million dollars ($9,000,000.00). Less than one-fourth of this cost is recovered through the sale of copies. The remainder is received through the sale of advertising space. For example, in the fiscal year 1956, the gross revenue of Woman's Day, Inc. was $9,075,729.00 of which $2,170,850.00 or 24 per cent came from sales of the magazine and $6,904,879.00 or 76 per cent from advertising revenue. The advertising revenue is divided between "supplier" and "non-supplier" ad-

vertising. "Supplier" advertisers are manufacturers or producers—such as the defendant suppliers—whose products are sold in A & P stores. "Non-supplier" advertisers are manufacturers or producers whose products are not sold in and are not of a type sold in A & P stores. In 1954, of the total gross advertising revenue, 73.3 per cent came from supplier advertisers, while 26.7 per cent came from non-supplier advertisers. In 1955, of the total gross advertising revenue, 65.5 per cent came from the supplier advertisers while 34.5 per cent came from the non-supplier advertisers.

34. No purchasing agent or any other person employed by A & P has ever discussed with A & P suppliers the latter's advertising in Woman's Day or has ever intimated that such advertising would be considered by A & P in determining the extent of its purchases of their products or the prices it would pay for them.

35. Advertising in Woman's Day by manufacturers of food products has no effect on the prices paid by A & P for products purchased by A & P from such advertisers for sale in A & P retail stores.

36. Whether food manufacturers do or do not advertise in Woman's Day is not considered by A & P in deciding whether or to what extent to purchase their products.

37. A & P employees engaged in purchasing and selling grocery products have no contact with Woman's Day advertising space salesmen.

38. The extent to which A & P promotes or merchandises the products of its suppliers is not affected by the fact that such suppliers do or do not advertise in Woman's Day or the extent of any such advertising.

39. At no time has any merchandising help been given to Morton by A & P by virtue of the fact that Morton advertises in Woman's Day or for any other reason, despite repeated efforts by personnel of Morton's advertising agency to obtain such merchandising help.

40. General Foods and Hunt Foods knew at all times that they could not get any merchandising support from A & P by reason of their advertising in Woman's Day.

41. In selling advertising, Woman's Day, Inc. has consistently stated to the advertiser that the purchase of advertising space in Woman's Day is completely independent of the buying or selling activities of any A & P affiliated company.

42. Each advertising rate card issued by Woman's Day, Inc. since the inception of the magazine has contained substantially the following sentence:

"It is distinctly understood that the purchase of advertising space in Woman's Day has no relation, direct or indirect, to the buying and/or selling activities of any affiliated company."

43. Woman's Day has always sold its advertising space, including that sold to defendant suppliers, solely on its merits as advertising and on no other consideration.

44. Woman's Day, Inc. has consistently refused requests from grocery product advertisers that Woman's Day, Inc. supply them with promotional material or assist them in procuring store promotion and merchandising of their products.

45. Woman's Day, Inc. has extended no merchandising aid to defendant suppliers.

46. Woman's Day space salesmen have not approached anyone in the General Foods, Hunt Foods or Morton organizations outside of the personnel in the advertising department. The presentation of such representatives of Woman's Day is identical with that made in the course of their calls upon advertising agencies and does not include any suggestion or intimation that advertising in Woman's Day would in any way aid or abet the advertiser with respect to merchandising his products in A & P stores.

47. Morton at its own expense prepared so-called "shelf-talkers" to be used in connection with Morton's product displays in stores. These shelf-talkers stated that the product is "as advertised in —————— magazine." Woman's Day, Inc., however, refused permission to Morton thus to report its advertising in Woman's Day and use such shelf-talkers in A & P stores. However, permission to use such shelf-talkers was granted by Life, Good Housekeeping, and the other grocery store magazines.

48. "Woman's Day" is of comparable content and quality with the leading women's magazines such as "Good Housekeeping," "Ladies' Home Journal," "Woman's Home Companion" and "McCall's."

49. Woman's Day, Inc. is operated as a legitimate business enterprise. Its business is that of publishing a magazine to be sold on its own merits as a magazine.

50. "Woman's Day" is not a device for giving merchandising aid to A & P suppliers, nor has Woman's Day, Inc. or A & P given any merchandising aid to defendant suppliers by virtue of their advertising in "Woman's Day."

51. A & P's purchasing power is not utilized to obtain advertising for "Woman's Day" from A & P suppliers.

52. The grocery retailing business of A & P and the magazine publishing business of Woman's Day, Inc. are conducted as separate business enterprises.

53. All advertising in Woman's Day, including the advertising of the products of defendant suppliers and of A & P, its subsidiaries and divisions, is placed through independent advertising agencies pursuant to contracts between Woman's Day, Inc. and the advertising agency handling the account of the advertiser.

54. The advertising agencies that have been used by defendant suppliers are as follows:

| | |
|---|---|
| General Foods | Young & Rubicam, Inc. |
| | Benton & Bowles, Inc. |
| | Foote, Cone & Belding. |
| Hunt Foods | Young & Rubicam, Inc. |
| | Batten, Barton, Durstine & Osborne, Inc. |
| Morton Salt | Needham, Louis & Brorby, Inc. |
| | J. Walter Thompson Co. |
| | Kenyon & Eckart |
| | Hill Blackett & Co. |

55. The advertising by defendant suppliers in Woman's Day is only a small portion of the carefully planned national advertising programs for their various products which in general include other magazines, newspapers, billboards, radio, television and other media.

56. Advertising programs for the products of defendant suppliers are periodically prepared by their advertising agencies based upon studies undertaken by the latter, are considered by the appropriate company executives and, if approved by them, are executed by the agencies.

57. Defendant suppliers have placed their advertising in Woman's Day upon the recommendations of advertising agencies representing them, which recommendations are often arrived at after careful consultation between the advertising agency and the advertiser. These recommendations were based by the agencies solely upon their evaluation of Woman's Day as an effective advertising medium for the sale of the products of their respective clients to the consumer public.

58. The criteria used by the advertising agencies and executives of defendant suppliers in determining whether or not Woman's Day is to be included in a media schedule are the same ones that apply to the selection of any other magazine or medium.

59. In arriving at their advertising media decisions, the advertisers and the agencies take into consideration studies and surveys made by themselves and by others. Various factors are considered, such as circulation, number of readers, type and location of readers, cost, characteristics of the magazine and its readers, and comparisons with other advertising media.

60. G. W. Carrington, Advertising Manager of Morton, testified as follows:

"The sole factors considered by Morton in determining the media in which to advertise are as follows, but not necessarily in the order of importance: (1) total circulation, (2) cost per thousand circulation, (3) gross cost, (4) characteristics of the readers (i. e., sex, age, education, social status, shopping functions, etc.), (5) geographical circulation and circulation in terms of population density (metropolitan areas vs. rural areas), both as compared with (a) Morton sales, and (b) total grocery stores sales, and (6) quality of printing reproduction.

"Morton considers all store distributed magazines, including Woman's Day, only in the light of the above factors. Viewed in this light, Morton has considered this type of advertising to be very effective because, in terms of factor (4) above, it reaches (1) women only, for the most part, and (2) women who do the grocery shopping for their families. Consequently, Morton's conclusion has been that there is virtually no advertising waste in store magazines, such as probably occurs in the use of general publications.

"Morton has always considered the use of all the store magazines simply as an integral part of its entire advertising program."

61. During the period from January 1, 1954, to March 31, 1956, Hunt Foods advertised Hunt's Tomato Sauce in each monthly issue of Woman's Day commencing with the October, 1954 issue through March, 1956 excepting therefrom the December, 1955 issue. It advertised Hunt's Tomato Catsup in the issues of September, October, November and December, 1955. It advertised Hunt's Tomato Paste in Woman's Day in the November and December, 1955 and January and February issues of 1956. It had no other advertisements in Woman's Day from January, 1953 to March 31, 1956, inclusive. It did not advertise any of its other products whether Hunt brand, Snider's brand or other brand in Woman's Day at any time between January 1, 1953 and March 31, 1956. None of Hunt Foods' advertisements in Woman's Day mention its Snider's brand or Pride of the Farm brand or any brand other than Hunt's.

62. The advertisements of General Foods products in Woman's Day since January 1, 1954 are as follows:

| General Foods Products | Whether, and Issue When, Advertised |
| --- | --- |
| Baker's Coconut Products | No |
| Baker's Chocolate, Cocoa Products | No |
| Gaines Dog Foods | No |
| Log Cabin Syrups, Syrup Mixes | Mar. 1954 |
| Satina Laundry Products | No |
| Go Laundry Products | No |
| La France Laundry Products | No |
| Birds Eye Meat Pies | Feb. 1956 |
| Birds Eye Fish Sticks | Mar. 1956 |
| Birds Eye Frozen Foods, Vegetables, Fruits | Jan., Feb. 1954; Nov. 1955; Jan., Feb. 1956. |

| General Foods Products | Whether, and Issue When, Advertised |
|---|---|
| Birds Eye Juices | No |
| Jack & Jill Cat Food | No |
| Minute-Man Instant Frosting | No |
| D-Zerta Gelatin | No |
| Jell-O Gelatin | July, Aug., Sept., Oct., Nov. 1955; Feb. and Mar., 1956. |
| Jell-O Pudding and Pie Filling | Sept., Oct., Nov., Dec., 1954. |
| Jell-O Instant Pudding | No |
| Jell-O Tapioca Pudding | No |
| Minute Rice | Aug., 1955 |
| Minute Mashed Potatoes | No |
| Minute Tapioca | No |
| Swans Down Cake Flour | Sept., Oct., Dec., 1955; Feb., 1956. |
| Swans Down Cake Mixes | Feb., Apr., 1954; May, June, 1955. |
| Calumet Baking Powder | No |
| Certo Pectins | No |
| Sure-Jell Pectins | No |
| Yuban Coffee | No |
| Kaffee Hag Coffee | No |
| Maxwell House Regular Coffee | No |
| Maxwell House Instant Coffee | Jan., Feb., March, 1954 |
| Sanka Coffee | No |
| Sanka Instant Coffee | No |
| Kool-Aid Soft Drink Powder | No |
| Kool Shake Mix | No |
| Good Seasons Dressing Mix | No |
| Post Cornfetti | No |
| Post Toasties Corn Flakes | No |
| Post Bran Flakes | No |
| Post Raisin Bran | No |
| Post Wheat Meal | No |
| Post Grape-Nuts | No |
| Post Grape-Nuts Flakes | July, Aug., Oct., Nov. 1954 |
| Post Sugar Crisp | June, Sept., 1954 |
| Post Sugar Krinkles | No |
| Post Tens | May, Sept., 1954 |
| Postum | Jan., Feb., Mar., 1955 |
| Instant Postum | Oct., Nov., 1954 |

63. Morton did not advertise any of its products in Woman's Day from 1937 through 1940 or from 1943 through 1950.

64. The inclusion or absence of advertising in Woman's Day of products of defendant suppliers handled by A & P has had no effect on the prices paid by A & P for such products.

65. Total advertising expenditures and the amount spent for advertising in Woman's Day by each of defendant suppliers from 1953 through 1955 are shown in the following table:

| Supplier | Year | Total Advertising | "Woman's Day" Advertising |
|---|---|---|---|
| Morton | 1953 | $ 1,766,836 | $ 61,500 |
| | 1954 | 1,943,918 | 75,500 |
| | 1955 | 2,342,619 | 52,100 |
| Hunt Foods | 1953 | 3,415,000* | — |
| | 1954 | 2,531,000* | 31,500 |
| | 1955 | 5,741,000* | 229,963 |
| General Foods | 1954 | 62,021,000* | 376,281 |
| | 1955 | 62,015,000* | 292,945 |
| | 1956 | 75,180,000* | 199,060 |

* Fiscal years; remaining figures are for calendar years.

66. Various A & P divisions or subsidiaries advertise in Woman's Day the food products which they manufacture. These advertisements are placed in Woman's Day through the independent advertising agency of Paris & Peart, Inc. in the same manner and at the same rates charged all other advertisers.

67. Over half of the advertisers in Woman's Day are non-suppliers, i. e., manufacturers whose products are not sold in A & P stores. In 1954, 209 (50.7 per cent) of a total of 412 advertisers were non-suppliers. In 1955, the percentage of non-suppliers increased to 52.4 per cent. Among these non-supplier advertisers are such companies as Frigidaire Division of General Motors, General Electric Co., International Harvester Co., Philco Corporation, Corning Glass Works, Western Electric Company, RKO Radio Pictures, Inc. and Inland Steel Container Co.

68. The non-suppliers provide a substantial portion of Woman's Day advertising revenue. In 1954, advertising revenue from non-suppliers amounted to $2,508,822 out of total advertising revenue of $9,413,843. In 1955, non-suppliers paid $3,205,488 out of the total advertising revenue of $9,279,181. In that same year, $2,170,850 was received by Woman's Day, Inc. from the sale of copies of Woman's Day to A & P and to distributors in Colorado.

69. Woman's Day advertising rates are comparable to and competitive with those charged by magazines of comparable national circulation.

70. Woman's Day advertising rates are based upon a guarantee of a specific net paid advertising circulation during the calendar year. Certifications of circulation are made periodically by the Audit Bureau of Circulations, of which Woman's Day, Inc. is a member.

71. As with all other advertisers in Woman's Day, payments for the advertisements of defendant suppliers therein are not made to Woman's Day, Inc. or to A & P but, rather, are made by the respective advertising agencies of defendant suppliers direct to Woman's Day, Inc. at the full published advertising rate applicable to all advertisers less the usual 15 per cent agency commission. The advertising agencies collect from the advertiser the full charge for the space purchased.

72. During the period pertinent to this case, neither Woman's Day, Inc. nor A & P has ever received any money or other consideration from any defendant supplier, except for certain advertising allowances to A & P offered simultaneously to all retail grocers in specified areas.

73. The A & P subsidiaries and divisions pay the full charge for all of their advertising in Woman's Day and Woman's Day, Inc. has never given them any refunds, rebates, credits, gratuities or allowances with the exception of the circulation billing adjustments given to all advertisers when the circulation guarantee is not met.

74. The dividends paid by Woman's Day, Inc. to A & P (Maryland), averaging $39,736 per year since 1937, are negligible in comparison with A & P's total dollar sales which have been in excess of $4,000,000,000 per year since 1953.

75. There is no evidence that the payments by any or all of defendant suppliers for advertising in "Woman's Day" enabled A & P (New Jersey) to sell its products at prices lower than those charged by plaintiffs for identical or comparable products.

76. "Woman's Day" is a legitimate advertising medium and is not, either in intent or effect, a device to give hidden price discriminations to a preferred buyer.

77. The payments by defendant suppliers for advertising in "Woman's Day" are made to their advertising agencies and are not made to A & P or to Woman's Day, Inc.

78. Defendant suppliers have received bona fide advertising value, comparable in degree to that received from other leading national magazines, in return for their payments for advertising in "Woman's Day."

79. Defendant suppliers have received nothing but advertising benefit in return for their payments for advertising in "Woman's Day."

80. "Woman's Day" is not made possible by the advertisements of any defendant supplier; nor do defendant suppliers furnish, or contribute to the furnishing of, "Woman's Day" to A & P.

81. "Woman's Day" is not connected with the resale by A & P of any specific product or products of any defendant supplier.

82. Inasmuch as Woman's Day is usually sold at the check-out counters it is customarily read outside the store.

83. None of the advertisements of defendant suppliers appearing in Woman's Day contain any reference to A & P (or to any other store) or the price at which the products may be purchased.

84. Advertising that is designed and intended to bring people into a particular grocery store customarily features the price of the product and the name or location of the store, and may be termed grocery store advertising. National brand grocery product advertising, on the other hand, advertises only the product, usually without mention of price or any particular store and does not suggest where the demand thereby created may be satisfied. The advertisements of defendant suppliers in Woman's Day are national brand grocery product, not grocery store, advertising.

85. The average American family shops at 3.7 stores per month, and two-thirds of all families shop in both chain and independent stores, averaging 4½ stores per month.

86. Plaintiffs have admitted that each day chain stores and independent stores within a wide radius "are actually competing for the trade of the same customer who interchanges his patronage."

87. The experience of G. F. Heublein & Bro. as stated in a letter to Woman's Day, Inc. on December 3, 1943, was that its advertisements of A-1 Sauce in Woman's Day substantially increased the sales of that product in stores competing with A & P, as well as in A & P stores.

88. The American housewife shops at the particular grocery store where she can get the brands and the products that she wants at prices that represent the best value to her.

89. Plaintiffs have admitted that Woman's Day is read by "large numbers of persons in addition to the purchasers." It cannot be assumed, therefore, that all Woman's Day readers shop at A & P.

90. Of the readers of Woman's Day, 16 per cent also read Better Living, 10 per cent also read Everywoman's and 32 per cent also read Family Circle.

91. Inasmuch as defendant suppliers advertised frequently in other magazines, including other store magazines, as well as in other advertising media, Woman's Day readers are exposed to the same ad-

vertising influence from other media, including other magazines, as from Woman's Day.

92. Morton has customarily placed four full-color advertisements per year in every magazine used, and this policy has been followed in placing advertising in Woman's Day along with the other store magazines.

93. The products advertised by Morton in Woman's Day are the Blue Package salt, Miniatures and Salters.

94. The lack of relationship between unit sales of the Blue Package salt, which accounts for most of Morton's sales to A & P, and Morton's expenditures for Woman's Day advertising is shown by the following table:

| | Total Morton Sales to all Buyers | Total Morton Sales to A&P | % of A&P Sales to Total Sales | Total Morton Expenditures in "Woman's Day" |
|---|---|---|---|---|
| 1955 | 7,327,672 | 756,688 | 10.3 | $52,100 |
| 1954 | 7,526,283 | 725,234 | 09.6 | 75,500 |
| 1953 | 7,308,851 | 708,277 | 09.7 | 61,500 |
| 1952 | 6,861,703 | 635,942 | 09.3 | 56,470 |
| 1951 | 6,815,920 | 629,556 | 09.2 | 38,910 |
| 1950 | 7,424,172 | 681,670 | 09.2 | — |
| 1949 | 7,259,685 | 652,219 | 09.0 | — |
| 1948 | 6,783,408 | 619,383 | 09.1 | — |
| 1947 | 6,344,994 | 554,583 | 08.7 | — |
| 1946 | 5,433,468 | 452,040 | 08.3 | — |
| 1945 | 4,503,300 | 423,515 | 09.4 | — |
| 1944 | 3,727,858 | 380,532 | 10.2 | — |
| 1943 | 3,347,914 | 382,461 | 11.4 | — |
| 1942 | 2,765,282 | 389,132 | 14.1 | 14,065 |
| 1941 | 2,449,521 | 333,111 | 13.6 | 10,051 |
| 1940 | 2,302,277 | 312,348 | 13.6 | — |
| 1939 | 2,270,094 | 298,101 | 13.1 | — |

95. Hunt Foods' sales to A&P did not increase as much percentagewise in 1955, the year in which it advertised substantially in Woman's Day, as did Hunt Foods' sales to all customers.

(a) In its fiscal 1954 Hunt Foods spent $31,500 in advertising in Woman's Day; in 1955 it spent $229,963 in advertising in Woman's Day.

(b) In the same two years Hunt Foods' sales to A&P, as reflected by its charges to accounts receivable, were $3,-162,000 in 1954 and $3,972,000 in 1955, an increase of only 25.6%, whereas its total sales to all purchasers increased from $66,737,169 in 1954 to $85,558,310 in 1955, an increase of more than 28%.

96. A comparison of the tables showing sales of General Foods products to A&P and the time of advertising of the products in Woman's Day shows no pattern of relationship between the advertising and the sales to A&P.

97. A&P private brand products are sold in A&P stores in competition with some products of Hunt Foods and General Foods advertised in Woman's Day. Examples are as follows:

| General Foods Products | A & P Brand |
|---|---|
| Birds Eye Chicken, Vegetables, etc. (frozen foods) | A&P |
| Instant Maxwell House Coffee | A&P Instant Coffee |
| Jell-O Gelatin | Sparkle |
| Jell-O Puddings & Pie Fillings | Anne Page |
| Log Cabin Syrup | Anne Page |
| Post Grape-Nuts Flakes | |
| Post Sugar Crisp | Sunnyfield Cereals |
| Post-Tens | |
| Swans Down Cake Flour | Sunnyfield Cake Flour |

| Hunt Foods Products | |
|---|---|
| Catsup | Anne Page |
| Chili Sauce | Anne Page |
| Tomato Sauce | A&P |
| Canned Fruits and Vegetables | Sultana and Iona |

98. The General Foods advertisements appearing in Woman's Day feature the branded products sold by the various separately named divisions of General Foods, not General Foods itself.

99. The advertisements of Morton's, General Foods' and Hunt Foods' products appearing in Woman's Day are virtually identical with advertisements appearing in other magazines for the same products.

100. The opinion of Morton's Advertising Agency, as shown by the testimony of Otto R. Stadelman, Senior Vice-President and Media Director of Needham, Louis & Brorby, Inc., was that Morton's advertisements in Woman's Day did not increase the sales of its products in A&P except insofar as the over-all consumer demand for such products was increased in all grocery stores:

"The reasons for the Agency's recommendation of store magazines for Morton in particular were as follows: (1) Because of the nature of the product, it was felt that store magazines hit a mass customer group which was not duplicated substantially by any other media; and (2) because virtually the only buyers of the magazines are women who engage in the shopping activities for the family, there is no waste advertising usage.

"The Agency has never considered that the audience of store magazines is confined to the persons who shop only at the stores which distribute a particular magazine, but rather that their audience consists of persons who also shop at other grocery stores. The significance, then, of the fact that the store magazines are sold only within certain grocery stores is that their readers are thus confined to persons who buy groceries, without regard to where they may shop for them.

"The Agency's recommendation of store magazines was not based on the thought that Morton sales in particular stores would be increased because of the sale of a store magazine in those stores. On the contrary, the thinking of the Agency was that the store magazines did not increase the traffic in the store handling them, nor the sales in those particular stores of the products advertised in the magazines, except (as to the latter) insofar as the over-all consumer demand for such products was increased in all grocery stores, as it woud be, for example, by advertisements placed in Life and other magazines of general circulation."

101. The opinion of Morton's Advertising Department, as shown by the testimony of G. W. Carrington, Morton's Advertising Manager, was that its Woman's Day advertisements were influential in all stores, not just in A&P.

102. Morton, to promote purchases of its products by independent grocery stores as well as by chain stores, intentionally brought to their attention (through trade journal advertising and its salesmen's "portfolios") the fact that among the advertising media used by Morton was Woman's Day.

103. General Foods brought their advertising in Woman's Day to the attention of the trade generally through their salesmen's kits.

104. The purpose and effect of advertising in Woman's Day by defendant suppliers is to help sell the particular advertised product wherever it can be bought and not to favor one retailer over the other. This advertising was primarily designed to benefit each of the defendant suppliers with any benefits accruing to A&P being merely incidental.

105. To the extent that the Woman's Day advertisements of defendant suppliers are beneficial, i. e., result in increased sales of the advertised products, such benefit is shared by all grocers who handle the advertised products.

106. In view of the preceding finding, the Woman's Day advertisements of defendant suppliers result in no competitive advantage to A&P, and the benefit derived by A&P from such advertisements—in terms of any increased sales of the defendant suppliers' products—is not significant compared with the same benefit derived by defendant suppliers.

107. A comparison of A&P total annual sales and Woman's Day circulation, as shown by the graphs stipulated by the parties, shows that there is no relationship between the two. Woman's Day circulation increased rapidly from 1948 to 1952 and decreased from 1952 to 1955. However, A&P sales have increased steadily from 1948 to 1955.

108. The daily A&P sales in 65 A&P stores in the Chicago Metropolitan Area follow a regular weekly pattern of being low on Monday, Tuesday and Wednesday, increasing on Thursday and rising to a peak on Friday and Saturday. This pattern is not affected by the placing of Woman's Day on sale in those stores.

109. A&P and Woman's Day, Inc. caused to be made a Shopping Survey among 4,602 shoppers in 22 A&P stores located near each of plaintiff's stores.

(a) The persons who conducted the Shopping Survey and prepared the Survey Report are recognized experts in the field of consumer, customer and shopping surveys.

(b) The data gathered from the respondents is accurately reported in the Survey Report dated November 5, 1956.

(c) The sample design used in said Survey, the number of interviews conducted and the manner in which the interviews were conducted, were all in accordance with generally accepted standards of objective procedure in the field of opinion surveys.

(d) The form of the questions used and the manner of conducting the interviews were in accordance with generally accepted standards of objective procedure in the field of opinion surveys.

(e) The sample design utilized in the Survey was in accordance with generally accepted standards of statistical procedure for this type of survey.

(f) The entire Shopping Survey was conducted in accordance with prearranged operational schedules prepared by experts in the respective fields of statistical sampling, questionnaire drafting and field interviewing, and was designed by use of generally accepted scientific methods for opinion research and analysis.

(g) The sample design and all interviewer arrangements were prepared independently of A&P and its attorneys.

(h) Neither the interviewers nor the field supervisors engaged in the Shopping Survey were aware of the litigation, the

purpose of the survey or the use to be made of the results of the survey.

(i) The A&P store managers did not know in advance on what day or at what hours the interviewing would be conducted in their stores, and the interviewers had no contact with A&P personnel other than to present their identification cards to the store managers.

(j) The testimony of the planners, supervisors and workers as to the planning, conducting and reporting of the Shopping Survey was stipulated by the parties.

110. The results of the Shopping Survey are as follows:

(a) Out of the 4,602 shoppers interviewed in the Shopping Survey, only 16 (three tenths of one per cent) gave Woman's Day as one of the reasons for shopping at A&P, and only 10 (two tenths of one per cent) gave "A&P magazines" as a reason for shopping at A&P.

(b) At least three of the ten persons who listed "A&P magazines" were not referring to Woman's Day since, in response to a later question, these three said they never purchased Woman's Day. Thus, only 23 shoppers out of 4,602 (less than five-tenths of one per cent) gave Woman's Day or "A&P magazines" as one reason for shopping at A&P.

(c) Later in the questioning, the persons who said that they bought Woman's Day were asked whether they would do less shopping at A&P if the magazine were available at all grocery stores. Only 11 shoppers (two-tenths of one per cent) said they would shop less at A&P and none said, in response to the next question, that they would shop more at any of the plaintiffs' stores.

(d) A series of probing questions were used to elicit all reasons for shopping at A&P that each shopper might think worthy of mention. The 9,621 reasons given by the 4,602 shoppers are collated and tabulated below:

| Reasons | Number | Per Cent |
|---|---|---|
| Save money at A&P; like bargains; more reasonable than other stores ... | 2708 | 28.1 |
| Like A&P brands of specific groceries (meats, vegetables, produce, eggs, dairy); good food; like food | 1397 | 14.5 |
| Help courteous; pleasant; good service | 1067 | 11.1 |
| In neighborhood; close to work and/or home; saves time | 913 | 9.5 |
| Have anything you want; can do all shopping in one place | 759 | 7.9 |
| Like A&P products in general (specifies non-grocery items or could include non-grocery items) | 673 | 7.0 |
| Convenient (not specified whether to work and/or home or quick and easy check-out) | 597 | 6.2 |
| Self-service; quick and easy to find things and check out | 434 | 4.5 |
| Food fresher | 374 | 3.9 |
| Habit; used to shopping there | 242 | 2.5 |
| Neat clean store; shelves well-stocked | 160 | 1.7 |
| Like everything about the store | 152 | 1.6 |
| Special services: (parking lot, cash checks, evening hours) | 91 | .9 |
| Have friends there; know help | 28 | .3 |
| Like Woman's Day | 16 | .2 |
| Like A&P magazines (do not say which) | 10 | .1 |

111. Among the reasons people shop at a particular grocery store are: prices; convenience of location; friendliness and helpfulness of personnel; quality of merchandise; variety of brands carried; extent of stock; quality of fresh meats, vegetables, fruits; arrangement of store; cleanliness; quickness of check-

outs; convenient parking; air-conditioning; specials; premiums or trading stamps; delivery service; convenience of hours—if open some evenings; availability of credit; adjustment policy; policy on cashing checks.

112. S. W. Shea, who has been with A&P for 34 years, whose duties have required him to keep informed on sales volumes, trends and causes of increases or decreases in sales, and who is now General Sales Director of A&P, testified as follows:

"It is his considered opinion that the availability of Woman's Day in A&P retail stores does not increase the traffic in such stores."

113. The testimony of Harley V. McNamara, President of National Tea Co., plaintiffs' only witness, is stipulated by the parties. Mr. McNamara states that in 1950, when National Tea did not distribute a store magazine, "it was his belief that food store magazines * * * helped develop customer good will, and might develop store traffic and sales for the merchandise advertised therein." However, after six years' experience with a store magazine (Everywoman's), Mr. McNamara concluded only that the magazine had aided "in maintaining and developing customer good will," saying nothing about the magazine as a sales or traffic builder.

114. In the Price Survey (A&P Exhibit 26), prices were checked on 99 different items in all plaintiffs' stores and, to make up a pair with each plaintiff's store, in an A&P store near each plaintiff. All but 5 of the items were those selected by the Bureau of Labor Statistics of the U. S. Department of Labor for use in its Consumer Price Index. Together, the items make up a typical "market basket."

115. In comparing prices between A&P and plaintiffs, the Price Survey established that:

(a) For every one of the twenty-four pairs of stores included in the survey, the total "market basket" was lower priced in the A&P store than in plaintiffs' store.

(b) The total "market basket" was 4.2 per cent higher in plaintiffs' stores than in A&P stores.

(c) On Friday and Saturday the price advantage of A&P stores over plaintiffs' stores on the total "market basket" was approximately double that which it was on other days. There was little variation between morning and afternoon or between each of the three weeks.

116. The Composites (A&P Exhibits 1 to 24) accurately reflect the following:

(a) A map of the locality in which each plaintiff retailer is situated, the area which the plaintiff marked on the map as approximating the area from which he believed he drew a majority of his customers, and the location of some of his competitors;

(b) A photograph of each plaintiff retailer, certain A&P stores and stores of independent and chain super markets in the vicinity of plaintiff's store; and

(c) The location of each of said stores on said map.

117. The Composites establish as to the area of each plaintiff's retail store one or more of the following factors:

(a) The nearest A&P is so far from plaintiff's store that competition between them is negligible.

(b) There are a number of chain stores or independent supermarkets, larger and more attractive than plaintiff, either close to the A&P or nearer to the plaintiff than the A&P.

(c) Price advantages, location, size, type of service, hours, parking facilities or variety of products make the A&P stores and other supermarkets more attractive to shoppers than plaintiff's store.

118. In addition to the grocery stores shown on the Composites, there are numerous other grocery stores near each plaintiff and each A&P in the same locality.

119. The Shopping Survey (A & P Ex. 25) was fairly and expertly planned and conducted.

120. If any plaintiff has lost or failed to gain any customers (and there is no evidence thereof), there are many stores other than A & P and many considerations other than "Woman's Day" which more logically are the cause of this loss or failure to gain.

121. If "Woman's Day" were no longer available at A & P, it would not necessarily follow that, even if some persons did stop patronizing A & P, they would choose plaintiffs' stores in preference to the many supermarkets and other grocery stores in the locality of the A & P.

122. The distribution of "Woman's Day" in A & P stores has no immediate impact on the sales of those stores.

123. "Woman's Day" cannot be isolated as a factor causing persons to shop at A & P stores.

124. The only benefits received by A & P from Woman's Day (other than increased consumer demand shared by A & P and other stores, resulting from product advertising in the magazine) are the following:

(a) Dividends paid by Woman's Day, Inc. to A & P (Maryland) averaging $39,736 per year since 1937.

(b) Mention of the "A & P" name or the fact that Woman's Day can be purchased only at A & P stores in advertising and promotional activities involving Woman's Day.

(c) Gross profit of 2¢ per issue on the sale of the magazine by A & P stores.

125. The entity which receives dividends from Woman's Day, Inc. is A & P (Maryland), the parent company, and not the several A & P companies which operate the retail stores and do the buying and advertising therefor. The latter have never received any dividends of any kind from Woman's Day, Inc.

126. The dividends paid by Woman's Day, Inc. are negligible in comparison with A & P net profit, before and after taxes.

127. In 1953, the percentage of the net profit of Woman's Day, Inc. to that of A & P was five-tenths of one per cent; in 1954, it was seven-tenths of one per cent. In 1955, Woman's Day, Inc. suffered a substantial loss.

128. The amounts spent on advertising by A & P are shown annually in the following table:

| Year | Amount |
| --- | --- |
| 1948 | $13,987,000 |
| 1949 | 17,298,000 |
| 1950 | 17,024,000 |
| 1951 | 18,100,000 |
| 1952 | 19,946,000 |
| 1953 | 20,620,000 |
| 1954 | 22,426,000 |
| 1955 | 23,697,000 |

129. The amount spent by Woman's Day, Inc. on newspaper, radio, and TV advertising which may result in advertising benefit to A & P is quite small:

| | Newspaper Space & Preparation | Radio and TV Time |
| --- | --- | --- |
| 1952 | $46,235 | none |
| 1953 | 32,192 | none |
| 1954 | 31,447 | none |
| 1955 | 4,665 | $25,544 |

In 1953 and 1954, minor amounts, not segregated on A & P's books, were spent on preparing suggestions for radio and TV spot material. The actual programming was done and paid for by A & P.

130. In those instances where the advertising by Woman's Day, Inc. was directed to the public (promotional signs, TV commercials, radio and TV spots in the summer of 1950, ads in New Yorker) the A & P advertising is limited to mentioning the "A & P" name or a statement that the magazine can be purchased only at A & P stores.

131. A substantial portion of Woman's Day, Inc. magazine advertising expenditures is for obtaining non-supplier advertising and for trade journals advertising directed at the advertiser and the agency, not the consumer. Examples are the motion picture, "A Geography of Retailing" and advertise-

ments appearing in National Advertising Journal, Advertising and Selling, Printers Ink, Tide, Sales Management, Media Digest, P. I. B., Advertising Age, Electrical Merchandising, Retailing Daily, Woman's Wear Daily, Sales Management, Boot and Shoe Recorder, and other similar magazines.

132. A & P has, at its own cost, engaged in substantial promotion of Woman's Day. With the exception of commercials on the TV program "Today" and TV spots in six cities in the summer of 1950, A & P has paid for all radio and TV advertising of Woman's Day. A & P has paid the cost of all inserts in store newspaper advertisements featuring Woman's Day, except those appearing in the summer months of 1952, 1953 and 1954.

133. The net benefit which A & P receives from promotional activities of Woman's Day, Inc. is not significant in view of the relatively small amounts spent by Woman's Day, Inc. for such promotion, the limited advertising benefit to A & P from such promotion and the necessity of offsetting even these benefits by the expenses incurred by A & P itself in promoting "Woman's Day."

134. No payment for advertising in "Woman's Day" by any A & P supplier enables A & P to shift to such supplier a substantial portion of the advertising costs of A & P.

135. Whatever benefit is derived by A & P from "Woman's Day" and the advertisements therein is incidental in comparison with the benefit derived by a supplier of A & P from its payments for advertising in "Woman's Day."

136. There are five major store magazines other than Woman's Day that are or were obtainable only at retail grocery stores. However, only three of these are currently being published. Pertinent facts concerning these five magazines are as follows:

Family Circle: This magazine started publication in September 1932. Its retail price is now 7¢, having been raised from 5¢ in April 1956. It is available to and obtainable in various stores (other than plaintiffs' stores) throughout the United States, including the stores of Albers Super Markets, Inc., American Stores Company, H. C. Bohack Company, Inc., H. E. Butt Grocery Company, Dixie-Home Stores, First National Stores, Inc., The Grand Union Company, H. G. Hill Stores, Inc., Jewel Tea Co., Inc., The Kroger Company, Red Owl Stores, Inc., The Safeway Stores, Inc., J. Weingarten, Inc., Winn & Lovett Grocery Company, Fur's Inc., Hinke & Pillot, Inc., Krambo Food Stores, Inc., Big Chain Stores, Inc., Child's Food Stores, Inc. and Food Fair Super Markets.

Western Family: This magazine started publication in June 1941. It is given away free in stores served by various outlets in the western part of the United States.

Everywoman's: This magazine started publication in January 1951. Its retail price is now 7¢, having been raised from 5¢. It is available to and obtainable at various independent grocery stores and chains throughout the United States. In the Chicago Metropolitan Area it is only available to and obtainable at the stores of the National Tea Company.

American Family: This magazine started publication in January 1948 and suspended publication in June 1954. Its resale price was 7¢, having been raised from 5¢. It was available at stores of 17 independent store groups, including the Independent Grocers' Alliance, Progressive Food Stores, Inc., Certified Grocers of Illinois, Inc., Central Grocers Cooperative, Cardinal Food Stores, Royal Blue Stores, Grocerland Cooperative, Inc., Spot-Lite Stores, and certain of the plaintiff's stores who were members of such groups. This magazine was also available to retail stores purchasing from a number of independent wholesalers throughout the United States, including Holleb & Co., Monarch Finer Goods (a Division of Consolidated Foods Corporation), and others in the Chicago Metropolitan Area.

Better Living: This magazine started publication in May 1951 and suspended publication in May 1956. Its resale price was 7¢, having been raised from 5¢. It was available in various independent grocery stores throughout the United States. In Chicago it was available to and obtainable at independent grocery stores who were members of the Super Market Institute, Certified Grocers of Illinois, Inc., Oh Boy Stores, various independent stores, and certain of the plaintiffs' stores as indicated in the Summary of Store Facts.

137. In the Chicago Metropolitan Area, the following purchasing cooperatives which independent retailers may join offered to its customers either American Family or Better Living at some times during the last two years:

Certified Grocers of Illinois, Inc. (Certified)

Central Grocers Cooperative, Inc. (Centrella)

Grocerland Cooperative, Inc. (Grocerland)

Independent Grocers' Alliance (IGA)

Progressive Food Stores, Inc. (Progressive)

138. American Family was available to retail stores purchasing from a number of independent wholesalers throughout the United States, including Holleb & Co., Monarch Finer Foods and others in the Chicago Metropolitan Area, and Better Living was available to members of the Super Market Institute, Oh Boy Stores and various independent stores.

139. Of the twenty plaintiff retailers, seventeen (operating 22 of the plaintiffs' 25 stores) purchased their groceries from one of these purchasing cooperatives or independent wholesalers who distributed American Family or Better Living:

| | |
|---|---|
| Certified: | Dominick's Finer Foods, Inc., Cicero Lake Food Mart, Stevens Certified Super Mart (2 stores), and Save-Way Food Mart |
| Centrella: | Berg's Food Store, Franklin Grocery and Market, Fifth Avenue Food Mart, and Carl A. Schletz, Inc. |
| Grocerland: | Fruitland Foods |
| IGA: | Norwood Park IGA, Wagner Grocery and Market, Schuetz' IGA Food Store (2 stores) |
| Progressive: | Goldstein's Progressive Foods, Harvey's Super Mart, Clover Food Mart |
| Oh Boy: | Leo's Food Mart |
| Holleb and Monarch: | Alliance Meat Shop (3 stores) and Supreme Meat Market |

140. Not all of plaintiff retailers took advantage of the store magazines available to them. Thus, all four Certified stores handled Better Living or American Family. Two of the Centrella customers carried American Family and two did not. One of these, Muir (Fifth Avenue Food Mart), carried the magazine for only three months. Of the three IGA customers, only two distributed the available magazine and one of these (Schuetz) did not carry the magazine during all the time it was available. None of the plaintiffs who were customers of Progressive or Grocerland distributed American Family. Plaintiff Bernard (Leo's Food Mart), who bought from Oh Boy, occasionally handled Better Living, but Markus (Alliance Meat Shops and Supreme Meat Market), who bought from Holleb and Monarch, never sold a store magazine in any of his four stores, one of which is now closed.

141. Defendant suppliers have each advertised certain of their products in store magazines other than Woman's Day, including those which were available to and distributed by certain of the plaintiff retailers.

142. A store magazine other than Woman's Day was available to a substantial number of plaintiff retailers during the entire two-year period im-

mediately preceding the filing of the complaint herein.

143. Defendant suppliers have advertised their products in store magazines other than Woman's Day, one of which was available to a substantial number of plaintiff retailers during the entire two-year period immediately preceding the filing of the complaint herein.

144. During the two-year period immediately preceding the filing of the complaint herein, none of the plaintiffs, individually or collectively, published and distributed, directly or indirectly, a store magazine. Thus, no plaintiff was able to furnish to any of the defendant suppliers advertising space in a magazine published and distributed by it and for which each of the defendant suppliers would make payment.

145. At all times pertinent to the complaint, A & P purchased directly from defendant suppliers some of their products and is continuing so to do.

146. Hunt Foods has made no sales to any plaintiff retailer at any time during the period involved in the complaint. No employee of Hunt Foods called on any plaintiff retailer during the period involved. Hunt Foods has not at any time exercised any control over the price at which plaintiff retailers or any one else have purchased or sold any Hunt Foods product.

147. Hunt Foods sells more than 15 different products, some under the brand name of "Hunt" and some under other brand names—"Snider's" and "Pride of the Farm." Only three products of Hunt Foods were advertised in Woman's Day at any time and only one product prior to September, 1955. The record is silent as to whether any product sold by Hunt Foods to plaintiff wholesalers was advertised in Woman's Day, or as to whether any product of Hunt Foods sold by any plaintiff retailer was advertised in Woman's Day.

148. General Foods merchandises more than 50 different products, only 15 of which were advertised in Woman's Day at any time during the period involved in this suit and none was advertised regularly therein.

149. There is no evidence that either of the two plaintiff wholesalers sold any product of General Foods to any retailer who was competing with A & P in its resale at or near any time that it was advertised in Woman's Day.

150. The record is silent as to whether any product of General Foods sold by any plaintiff retailer was advertised in Woman's Day (except that Instant Maxwell House Coffee was advertised in the March, 1954 issue).

151. Hunt Foods made sales at all times pertinent to the complaint and are still making sales to plaintiff wholesalers and other wholesalers and cooperative purchasing organizations situated within the Chicago Metropolitan Area, who in turn sold such products to some retailers.

152. All of plaintiff retailers at some time or times since March 1, 1954, and some of plaintiff retailers at all times since March 1, 1954, have handled and sold to retail consumers one or more products of Hunt Foods.

153. General Foods has made at all times pertinent to the complaint, and still is making sales of various of its products to plaintiff wholesalers and to other wholesalers and cooperative purchasing organizations situated within the Chicago Metropolitan Area, which in turn have sold and sell such products to retailers.

154. Plaintiff retailers, Leo Bernard, Bernard Bruski, John E. Markus, Stanley Piekarz, Anthony Racz, Robert M. Wagner and Elizabeth Wagner, d/b/a Wagner Grocery and Market, Atlas Market Company, a corporation, and Carl A. Schletz, Inc., a corporation, have made no purchases of any product from General Foods at any time since January 1, 1954. The only products that have been sold by General Foods to any plaintiff retailer since January 1, 1954, are some products of Maxwell House Division.

155. Plaintiffs Goldstein and Muir Bros. made no purchases of Maxwell

House products for more than one and a half years after the appearance of the last issue of Woman's Day containing a Maxwell House advertisement.

156. Except as to Maxwell House products purchased from General Foods by some plaintiff retailers, the record is silent as to which, if any, products of General Foods advertised in Woman's Day were handled or sold by any plaintiff retailer.

157. General Foods paid for the advertisement of Instant Maxwell House Coffee which appeared in the March, 1954 issue of Woman's Day on February 28, 1954, prior to the period concerning which these suits are brought, and no Maxwell House advertisement has appeared in Woman's Day since that issue.

158. Each plaintiff retailer at some time since March 1, 1954, has handled and sold, and is presently handling and selling, to retailer consumers one or more products of General Foods.

159. General Foods does not exercise, and has not exercised at any time, any control of any kind over the resale price by anyone of any of its products.

160. Morton has sold and is selling its products to plaintiff wholesalers. All plaintiff retailers handled and sold to retail consumers products of Morton and have done so at all times pertinent to the complaint. However, Morton at no time pertinent hereto sold any of its products to said retailers.

161. Morton neither possessed nor exercised any control whatever over the price at which plaintiff retailers either purchased or sold Morton products, nor did Morton possess or exercise any control whatever over the relationship between cooperatives, jobbers or wholesalers, on the one hand, and retailers on the other hand.

162. Save only for possible instances of meeting competitive situations created by other salt producers, Morton has granted no differentials in price, discounts, rebates, refunds, advertising allowances, cooperative advertising deals or allowances, free goods or any other

consideration by reason of the purchases of its products which were not offered and made available to all customers or potential customers of Morton within a given marketing area, including A & P and plaintiffs herein.

163. At times the prices of some of General Foods' grocery store products were based on volume of purchase. Such prices applied uniformly to A & P and all other purchasers from General Foods within a marketing area. In addition, General Foods has from time to time, for limited periods, offered free goods, premiums or allowances, based upon purchase of stated units of a particular product by retailers. Such offers were available to all, including A & P, on the same or proportionally equal terms within a marketing area.

164. All rebates, refunds, free goods, allowances and discounts to the purchasers of Hunt Foods' products were made available on the same or proportionately equal terms to all retailers and wholesalers, including A & P, and the prices charged by Hunt Foods were on the same basis to all.

165. The prices paid by A & P for each of the products purchased from each defendant supplier are the prices published by the respective defendant suppliers on printed price lists published to the trade in general, including where applicable any quantity or other price consideration likewise published to the trade in general.

166. With the exception of products of the Maxwell House Division of General Foods, no plaintiff retailer purchased products of defendant suppliers directly from defendant suppliers and (with the same exception) there is no evidence that any plaintiff retailer handled or sold any product of General Foods or Hunt Foods that was advertised at any time in Woman's Day.

167. Each of the defendant suppliers maintained a direct relationship with each of the plaintiff retailers and other retailers similarly situated. Each defendant supplier furnished to each of the afore-described retailers services in

connection with the resale by that retailer of the commodity produced by the defendant supplier. Employees of the defendant, General Foods, known as sales representatives, visited the individual retailers within said area, including the plaintiffs, and made available directly to such retailers display and merchandising assistance and personnel, such as demonstrators, sign painters, window trimmers, artists, food display men, layout personnel and the like. Said defendant also furnished directly to said retailers a wide variety of in-store advertising material. In addition, promotional men were sent directly from the offices of the defendant, General Foods, to the said retailers, which promotional men took direct orders of General Foods' products which such representatives of General Foods themselves transmitted to a wholesaler or which said representatives of General Foods themselves wrote up for the retail grocer to send directly to his cooperative supplier, as the case might be. Such promotional representatives of General Foods made as many as eight or ten calls upon retail grocers in the Chicago area each and every day.

The defendant, Morton Salt, furnished direct sales advertising and promotional material to the aforesaid retailers and used personnel of Morton Salt to prepare the retailers' food, counter, window and shelf displays. In addition, Morton Salt salesmen made direct calls upon the individual retailers, giving them direct promotional assistance and materials. Frequently, the Morton Salt salesmen, to assure purchase of Morton products by the retailer, actually wrote out the order for the retailer on the order pad given by the cooperative buying group to the retailers. For retailers who were not members of such a cooperative, the Morton Salt salesmen themselves transmitted the order directly to the wholesaler or jobber designated by the retailer.

The defendant, Hunt Foods, made available to purchasers of the company's products window trimmers, stock cards and additional sales and promotional material.

168. None of the defendant suppliers have exercised any control over the prices at which their products are sold by the plaintiff retailers.

169. No defendant supplier has discriminated in favor of A & P in the prices at which its products are sold to wholesale or retail grocers.

170. There is no evidence that A & P knowingly induced or received any price discrimination from any defendant supplier.

171. There is no evidence that any plaintiff has lost sales or customers or profits as a result of the distribution of Woman's Day by A & P stores.

172. There is no evidence that the publication and distribution of Woman's Day has resulted in a decrease in A & P's cost of doing business or an increase in any plaintiff's cost of doing business.

173. There is no evidence that Woman's Day has attracted customers to A & P stores away from any of plaintiffs' stores.

174. There is no evidence that any retailer purchased less from any wholesaler because of the existence of Woman's Day or its distribution by A & P.

175. The plaintiff wholesalers did not sell to any plaintiff retailer.

176. There is no evidence that any plaintiff paid any more for his supplies, nor that he spent more for advertising nor that he sold any less products by reason of any defendant supplier's advertising in Woman's Day.

177. There are many differences among the retailer grocery stores and wholesale grocers in the Chicago Metropolitan Area, such as type of store or business, size, parking and credit facilities, hours of business, type of merchandise handled, advertising activities and methods of purchasing.

178. There is no evidence to indicate the number of retailers in the Chicago Metropolitan Area who sold General Foods products which were advertised in Woman's Day.

179. There is no evidence to indicate the number of retailers in the Chicago

Metropolitan Area who sold Hunt Foods products which were advertised, in Woman's Day.

180. No plaintiff was authorized by any other person to sue on behalf of or represent such other person in this litigation.

181. Three of the original plaintiffs in this action have withdrawn and no additional parties have intervened or joined as plaintiffs.

182. The legislative purpose of Sections 2(d) and 2(e) is as set forth in the Committee Reports as follows:

"Still another favored medium for the granting of oppressive discriminations is found in the practice of large buyer customers to demand, and of their sellers to grant, special allowances in purported payment of advertising and other sales-promotional services, which the customer agrees to render with reference to the seller's products, or sometimes with reference to his business generally. Such an allowance becomes unjust when the service is not rendered as agreed and paid for, or when, if rendered, the payment is grossly in excess of its value, or when in any case the customer is deriving from it equal benefit to his own business and is thus enabled to shift to his vendor substantial portions of his own advertising cost, while his smaller competitor, unable to command such allowances, cannot do so."

183. The legislative interpretation of the phrase "proportionally equal terms" as provided in Sections 2(d) and 2(e) is set forth at 80 Cong.Rec. 9416:

"But it is further claimed that the provisions of the bill with regard to advertising allowances work a hardship on the small manufacturer, in that they require such allowances to be granted to all competing customers on proportionally equal terms. But proportional to what? Proportional naturally to those customers' purchases and to their abili-

ty and equipment to render or furnish the service or facilities to be paid for."

Conclusions of Law

1. The Court has jurisdiction of the subject matter of this action and the parties hereto.

2. There can be no violation of the Robinson-Patman Act by reason of:

(a) The organization of Woman's Day, Inc. by A & P (Maryland) for the purpose of publishing the magazine Woman's Day; and

(b) The selection by Woman's Day, Inc. of A & P (New Jersey) as its customer to the exclusion of plaintiffs; and

(c) The rendering by Woman's Day, Inc. of advertising services as agreed and paid for in return for bona fide advertising payments from advertisers; and

(d) The acceptance by Woman's Day, Inc. of bona fide advertising payments from advertisers, including suppliers whose products are sold by A & P and plaintiffs, where the only benefit derived by A & P from such payments is incidental, both causally and quantitatively.

3. The payments of defendant suppliers for advertising in Woman's Day were not "to or for the benefit of" A & P for a "service or facility" furnished by A & P.

4. It was the intent of Congress that advertising payments are not unlawful under Sections 2(d) and 2(e) of the Clayton Act, as amended by the Robinson-Patman Act, where advertising services are rendered as agreed and paid for and where the recipient derives only an incidental benefit therefrom.

5. It was not intended by Congress that Sections 2(d) and 2(e) should be applied so as to hamper legitimate advertising.

6. To the extent that the Woman's Day advertisements of defendant suppliers are beneficial, i. e., result in increased sales of the advertised products, such benefit is shared by all grocers who handle the advertised products. There-

fore such advertisements are inherently non-discriminatory and are not, within the meaning of Sections 2(d) and 2(e), "in connection with" the resale of defendant suppliers' products by A & P.

7. Payments made to Woman's Day, Inc. by defendant suppliers were for the advertisements of specific products placed in the magazine Woman's Day by defendant suppliers through their respective advertising agencies and were not payments for the maintenance of the magazine itself.

8. The fact that the advertising payments of the three defendant suppliers is part of the total income of Woman's Day, Inc., does not make any defendant supplier responsible for the continued existence of Woman's Day. In the sense that the payments for advertising by all advertisers in Woman's Day might be said to help to "make possible" the continued existence of Woman's Day, such "fact" is of no legal significance.

9. The payments of defendant suppliers for advertising in Woman's Day do not constitute the furnishing or contributing to the furnishing of a service or facility by defendant suppliers to A & P.

10. Woman's Day is not a service or facility within the meaning of Sections 2(d) and 2(e).

11. Woman's Day is not a service or facility furnished "in connection with" the resale by A & P of products manufactured by defendant suppliers.

12. The payments by defendant suppliers for advertising in Woman's Day are not in violation of Sections 2(d) and 2(e).

13. Inasmuch as plaintiffs are unable to furnish the defendant suppliers with advertising space in a store magazine published and distributed by it, defendant suppliers' payments for advertising in Woman's Day are not in violation of Section 2(d) since it was thus impossible for the defendant suppliers to make such payments available to the plaintiffs on proportionally equal terms.

14. The payments by defendant suppliers for advertising in Woman's Day do not constitute, either directly or indirectly, a discrimination in price in favor of A & P in violation of Section 2(a).

15. A & P has neither induced nor received a direct or indirect price discrimination in violation of Section 2(a) and is not, therefore, in violation of Section 2(f).

16. No plaintiff has established the right to injunctive relief by proving a "threatened loss or damage by a violation of the antitrust laws" within the meaning of Section 16 of the Clayton Act.

17. Plaintiffs have failed to discharge their burden of proving, by a preponderance of the evidence, the following:

(a) That the payments to Woman's Day, Inc. for advertising in Woman's Day constitute, directly or indirectly, a discrimination by defendant suppliers in the price of their products in favor of A & P and against plaintiffs;

(b) That A & P knowingly induced or received such a discrimination in price;

(c) That the payments to Woman's Day, Inc. for defendant suppliers' advertisements in Woman's Day, either—

(i) Constitute payments to or for the benefit of A & P as compensation for a service furnished by or through A & P in connection with the sale of defendant suppliers' products by A & P; or

(ii) Constitute discriminations in favor of A & P and against plaintiffs as purchasers of a commodity from defendant suppliers by contributing to the furnishing of a facility to A & P connected with the sale of such commodity;

(d) That these payments to Woman's Day, Inc. constitute a price discrimination to A & P in the guise of a payment for advertising or that A & P derives from these payments a benefit to its own business equal to that derived by defendant suppliers and can thus shift to defendant suppliers substantial portions of its own advertising costs.

18. Plaintiffs' objection to the admissibility in evidence of A & P Exhibit 25,

the Shopping Survey, is overruled and the Shopping Survey is admitted in evidence.

### Judgment

Accordingly let judgment enter for each and all of the defendants and this cause is hereby dismissed at plaintiffs' costs.